**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC; | ) | |
| and GRACENOTE, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. _____ |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ACRCLOUD, LTD. | ) | |
| | ) | |
| Defendant. | ) | |

<u>**COMPLAINT FOR PATENT INFRINGEMENT**</u>

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff") and Gracenote, Inc. ("Gracenote" or "Plaintiff") (collectively, "Plaintiffs"), for their Complaint against Defendant ACRCloud, Ltd., ("ACRCloud" or "Defendant"), allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action for patent infringement brought against Defendant for infringement of United States Patent No.'s 7,783,889 ("the '889 Patent"), 8,065,700 ("the '700 Patent'"), 7,904,503 ("the '503 Patent"), and 7,623,823 ("the '823 Patent") (collectively, the "Asserted Patents").

<u>**PARTIES**</u>

2.      Plaintiff The Nielsen Company (US), LLC is organized and existing under the laws of the State of Delaware, with its principal place of business at 85 Broad Street, New York, New York 10004.

3.      Plaintiff Gracenote, Inc. is organized and existing under the laws of the State of Delaware, with its principal place of business at 2000 Powell Street, Suite #1500, Emeryville,

California 94608.  Plaintiff Gracenote, Inc. is a wholly-owned subsidiary of Plaintiff The Nielsen Company (US), LLC.

4.      According to public records, Defendant ACRCloud is a Hong Kong SAR, China registered company with its principal place of business at Hang Seng Castle Peak Road Building, Room 1102, 399 Castle Peak Road, Cheung Sha Wan, Kowloon, Hong Kong SAR, China.

## JURISDICTION AND VENUE

5.      This is an action for patent infringement arising under the Patent Act, 35 U.S.C. §§ 1 *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Defendant ACRCloud consistent with the requirements of the Due Process Clause of the United States Constitution and the Delaware Long Arm Statute.  Defendant purposefully directs its infringing activities toward the United States in general and toward this District in particular.

7.      Defendant ACRCloud serves customers in the United States as well as Europe, Asia and Africa.  (*See ACRCloud*, https://www.acrcloud.com/, attached hereto as Exhibit A.)  As part of its accused infringing activities, ACRCloud provides an "audio recognition platform" for audience measurement.  (*Id.*)  ACRCloud makes its products and services available to clients in the United States. (*Id.*)  ACRCloud collects data and provides products and services through Amazon WebServices ("AWS") in the United States.  (*See Amazon, AWS Case Study: ACRCloud*, https://aws.amazon.com/cn/solutions/case-studies/acrcloud/, Google-translated version from the original Mandarin attached as Exhibit B.)  TVision Insights, Inc., a US-based customer, has integrated ACRCloud's audio content software platform into its US-based audience metering platforms.  (*See ACRCloud, Advertising & Big Data,*

https://www.acrcloud.com/advertising-big-data/, attached hereto as Exhibit C.)  On information and belief, ACRCloud products and services are made readily available and used by consumers in this District.

8.      Accordingly, ACRCloud has established at least minimum contacts within this District and has purposefully availed itself by conducting its activities in this District.  Thus, the exercise of personal jurisdiction over ACRCloud would not offend traditional notions of fair play and substantial justice.  In addition, or in the alternative, this Court has personal jurisdiction over ACRCloud pursuant to Federal Rule of Civil Procedure 4(k)(2).

9.      Venue is proper pursuant to 28 U.S.C. § 1391(c)(3) because Defendant does not reside in the United States.

## FACTUAL BACKGROUND

10.      Founded in 1923 by Arthur C. Nielsen, Nielsen is the media industry's leading data and analytics company.  Nielsen fuels the industry with an accurate understanding of what people watch and listen to.

11.      Measuring across all channels and platforms – from traditional linear television to streaming TV to social media and on-line video/audio platforms – Nielsen helps its clients and partners optimize the value of their marketing investments and growth strategies.  Nielsen offers measurement and analytics services in nearly 60 countries.

12.      Nielsen is a leading innovator in the field of audio automatic content recognition ("ACR") and has been awarded numerous patents for its inventions in the field, including the '889 Patent, the '700 Patent, and the '823 Patent.  Nielsen's audio ACR innovations have been a key to enabling its industry-leading measurement and analytics products and services.  Nielsen has invested millions of dollars in its audio ACR inventions.

13.    Gracenote is one of the world's leading entertainment data and technology companies and is at the forefront of how multimedia is experienced.  Gracenote offers multiple products that have revolutionized users' experience of music and video.

14.    Gracenote has also been at the forefront of ACR technology, and has been awarded numerous patents for its inventions in the field, including the '503 Patent.

## THE ASSERTED PATENTS

### *The '889 Patent*

15.    The '889 Patent, entitled "Methods and Apparatus for Generating Signatures," was duly and legally issued by the United States Patent and Trademark Office (the "USPTO") on August 24, 2010.  A true and correct copy of the '889 Patent is attached hereto as Exhibit D.

16.    Nielsen is the assignee and owner of all right, title, and interest in the '889 Patent. The '889 Patent is valid and enforceable.

17.    The '889 Patent is directed to, among other things, specific technological systems and methods including, among other components, software executing on hardware, for generating digital spectral signatures based on audio content streams.  (*See, e.g.*, '889 Patent, Ex. D, 2:27-49, Claims 1, 8, 14.)  Such signatures are matched to reference signatures to identify content being consumed by an audience.  (*See* '889 Patent, Ex. D, 3:30-46.)  This content identification, in turn, may be part of broader audience measurement systems or methods (*e.g.*, systems and methods that determine the number of individuals watching particular content). (*See* '889 Patent, Ex. D, 1:22-25.)

18.    More specifically, the '889 Patent relates to, among other things, methods and apparatuses for generating signatures by: (i) performing a spectral transform operation on a first frame of media samples to identify first and second frequency components having first and

second spectral power values; (ii) determining a first descriptor of the first frame of media samples based on a comparison of the first and second spectral power values; (iii) identifying third and fourth spectral power values in a second frame of media samples that is consecutive to, and overlapping with, the first frame of media samples; (iv) determining a second descriptor of the second frame of media samples based on a comparison of the third and fourth spectral power values; and (v) generating first and second signatures based on the first and second descriptors. (*See*, *e.g.*, '889 Patent, Ex. D, Claim 8.)

19.     The declaration of Pierre Moulin ("Moulin Decl."), attached hereto as Exhibit E, is hereby incorporated by reference into this Complaint.

20.     In general, there are certain desirable technical characteristics for signatures such as the ones to which the '889 Patent relates.  (*See* Moulin Decl., Ex. E, ¶ 26.)  One such characteristic is that they should be "robust," which means that a slight modification (distortion) of the sample media does not result in a large modification of the signature.  (*Id.*)  Another such characteristic is that they should be "discriminative," which means that unrelated media are unlikely to produce similar signatures.  (*Id.*)  And a third such characteristic is that they should be computationally efficient in order to reduce computer processing requirements, especially for large-scale systems featuring large media libraries.  (*Id.*)

21.     Examples of "robust" signatures extracted from spatiotemporal signal representations are those whose bits are signs of descriptor components (positive or negative), as a distortion might somewhat change the descriptor values but is less likely to change the signs.  (*Id.*, ¶ 27.)  One variation of such a robust sign-based approach is the performance of a comparison operation.  (*Id.*)  For example, a descriptor or signature that is based on whether the power level of one frequency component is greater or less than the power level of another

frequency component is robust because distortion is unlikely to change the determination of which power level is greater (it is likely to change only the *extent* to which the greater component is greater, and not change *which* component is greater).  (*Id.*)

22.     Examples of "discriminative" signatures extracted from spatiotemporal audio representations are those that for each time segment describe a few key frequencies associated with audio tones.  (*Id.*, ¶ 28.)

23.     Examples of computationally efficient signatures are those that are not computed from a large number of frames and frequency components.  (*Id.*, ¶ 29.)

24.     The priority date of the '889 Patent is at least as early as August 18, 2004, which is the filing date of the provisional application upon which the '889 Patent is based.  (*See* '889 Patent, Ex. D.)  As of that date, it was not well-understood, routine, or conventional among those of skill in the art to generate digital spectral signatures using operations based on a small number of frequency components computed from individual frames of media samples, as claimed in all claims of the '889 Patent.  (*See* Moulin Decl., Ex. E, ¶ 30 (citing the '889 Patent, Ex. D, Claims 1, 8, and 14).)

25.     Before the priority date of the '889 Patent, people of skill in the art generated digital spectral signatures of audio or video content using operations based on complex spatiotemporal signatures.  (*See* Moulin Decl., Ex. E, ¶ 31.)  These methods rely heavily on interframe processing (*i.e.*, processing of data from multiple frames), which adds a layer of computation and implementation complexity relative to the intraframe methods (i.e., processing of data from within an individual frame) disclosed and claimed in the '889 Patent.  (*Id.*)

26.     All of the claims of the '889 Patent recite the use of a particular way to extract digital signatures from audio or video content.  (*Id.*, ¶ 32.)  The claims do not preempt all ways

of extracting signatures, nor do they preempt all ways of extracting signatures using intraframe methods.  (*Id.*)  Specifically, each of the claims recites identifying two frequency components within a single frame of media samples, comparing the power levels of the two frequency components, determining a descriptor of the frame of media samples based on the comparison of the two power levels, and generating a signature based on the descriptor ("the claimed approach").  (*Id.*)

27.     As of the priority date of the '889 Patent, the claimed approach was not well-understood, routine, or conventional among those of skill in the art.  (*Id.*)

28.     There are several technical advantages to using the claimed approach.  (*Id.*, ¶ 33.) First, the claimed approach is more computationally efficient than the prior art (*i.e.*, the signatures are simpler and easier to compute), as the processing does not require combining multiple frames.  (*Id.*)  In addition, only a small number of frequency components need to be processed.  (*Id.*)  This increased efficiency allows for a reduction (as compared to the prior art) in computational resources needed for signature generation.  (*Id.*)  This is particularly important in solving a prior art technical problem for large-scale systems – namely, the problem that a very large number of signatures must be generated and a very large amount of computational resources is needed.  (*Id.*)

29.     Related to the above-discussed advantage of computational efficiency, the claimed approach also provides the technical advantage that it is easier than the prior art in terms of implementation.  (*Id.*, ¶ 34.)

30.     Another technical advantage of the claimed approach over the prior art is that it provides robustness.  (*Id.*, ¶ 34.)  Specifically, the claimed approach provides robustness because it is a variation of a sign-based approach based on comparisons of power levels.  (*Id.*)

31.     Yet another technical advantage of the claimed approach over the prior art is that it provides discriminativeness.  (*Id*.)  Specifically, signatures are derived from descriptors based on a few key frequencies.  (*Id*.)

*The '700 Patent*

32.     The '700 Patent, entitled "Methods and Apparatus for Identifying Audio/Video Content Using Temporal Signal Characteristics," was duly and legally issued by the USPTO on November 22, 2011.  A true and correct copy of the '700 Patent is attached hereto as Exhibit F.

33.     Nielsen is the assignee and owner of all right, title, and interest in the '700 Patent. The '700 Patent is valid and enforceable.

34.     The '700 Patent is directed to, among other things, methods and apparatuses covering technological improvements for metering exposure to audio and/or video content using discriminative audio feature characteristics of the signals.  (*See* '700 Patent, Ex. F, 2:50-58, Claims 1, 8, 15.)  The claimed apparatus and methods cover receiving a particular type of signature associated with audio content presented at a monitoring site such as a television.  The signature is based on a plurality of time intervals between audio features of the audio content presented at the monitored site.  The content is identified based on the received signature.  (*See* '700 Patent, Ex. F, Claims 1, 8, 15.)

35.     More specifically, the '700 Patent relates to, among other things, methods and apparatuses for identifying audio content presented at a monitored site by: (i) receiving or generating a signature associated with audio content presented at a monitored site; (ii) where that signature is based on a plurality of time intervals between audio features of the audio content (for example, such audio features may include peak values and zero crossings); and (iii) identifying

the content presented at the monitored site based on the signature.  (*See*, *e.g.*, '700 Patent, Ex. F, Claims 1, 2, 8, 9.)

36.     The priority date of the '700 Patent is at least as early as October 17, 2003, which is the filing date of the provisional application upon which the '700 Patent is based.  (*See* '700 Patent, Ex. F.)

37.     The creation of a signature based on the selection of time intervals tied to distinguishing audio features, as claimed in the '700 Patent, enhances the discrimination and robustness of the systems. (*See* Moulin Decl., Ex. E, ¶ 35.)

38.     As of the priority date, it was not well-understood, routine, or conventional among those of skill in the art to generate digital spectral signatures using operations that depended upon important distinguishing audio characteristics of the audio/video signal, such as peak values or zero crossings or other characteristics.  As a result, and as stated in the '700 Patent, techniques that existed in the prior art limited or prevented the identification of content or incorrectly identified the content.  (*See* Moulin Decl., Ex. E, ¶ 36 (citing the '700 Patent, Ex. F, 1:62-2:2).)

39.     The selected distinguishing signal features of the claims may be, for example, peak signal values.  In the claims of the '700 Patent, the time intervals between those peaks are used to generate the signatures.  (*See* Moulin Decl., Ex. E, ¶ 37 (citing the '700 Patent, Ex. F, Claims 2, 9, 16).)  In addition, or in the alternative, the time intervals between distinctive zero crossings may be used to generate signatures.  (*Id.*)  In the claimed system, the time intervals are not preset to a certain equal length but vary based on the time intervals between the distinguishing features of interest.  (*See* Moulin Decl., Ex. E, ¶ 37.)

40.     The claims of the '700 Patent do not preempt all ways of generating, receiving, and processing digital signatures.  (*Id.*)  Specifically, each of the claims recites a particular way of identifying audio content using a received signature that is based on a plurality of time intervals between audio features of the content.  As of the priority date of the '700 Patent, the claimed approach was not well-understood, routine, or conventional among those of skill in the art.  (*Id.*)

41.     There are several technical advantages over the prior art to using the claimed approach of the '700 Patent.  First, the claimed approach of receiving and processing signatures that are based on time intervals defined by specific discriminative audio features creates a much more unique identifier for content.  (*Id.*, ¶ 38.)  The audio features in the signature, such as signal peaks and zero crossings, create more discriminative signatures in the sense that two unrelated media are unlikely to produce similar signatures that can lead to errors in matching.  (*Id.*)  As disclosed in the patent, this allows for more precise detection and identification of the content in the system.  (*Id.*)

42.     Another improvement over the prior art of the claimed approach is that signatures based on discriminative audio features and corresponding time intervals makes for a much more robust system in the presence of ambient noise and distortions in the playing device.  (*Id.*)  This improves accuracy in detection.  (*Id.*) Thus, the improvements in the hardware and software that implement the claimed approach provide a solution to the problem in the prior art in which identification of content using less unique signatures could lead to failures or limitations in accurately identifying content.  (*Id.*)

*The '503 Patent*

43.     The '503 Patent, entitled "Method of Enhancing Rendering of Content Item, Client System and Server System," was duly and legally issued by the USPTO on March 8, 2011.  A true and correct copy of the '503 Patent is attached hereto as Exhibit G.

44.     Gracenote is the assignee and owner of all right, title, and interest in the '503 Patent.  The '503 Patent is valid and enforceable.

45.     The '503 patent relates to, among other things, systems and methods for "enhancing" content for the enjoyment of a user by computing a hash value from the content itself, and then using the hash value as an identifier to access a database for enhanced content.  In particular, the '503 patent recites that a portion of content that can be played by a client system is received at a server system comprising hardware and software.  This portion of the content alone (without the need for any auxiliary information) is processed at the receiving server system to create an identifier.  This identifier comprises a hash value.  The hash value identifier is then used to search a database to obtain enhanced information relating to the content.  (*See* '503 Patent, Ex. G, 4:38-46.)  For example, such enhanced content could be the song title, artist, photos or concert information associated with the song.  (*See* '503 Patent, Ex. G, 2:64-67.)  Once retrieved from a database at the server system, the enhanced content can then be sent to the user where the client device can display the additional content, thereby enhancing the content item for the user.  (*See* '503 Patent, Ex. G, 2:67-3:3.)

46.     More specifically, the '503 patent relates to, among other things, methods and apparatuses to enhance rendering of a content item by using a receiver and processor at a server system to: (i)  receive a portion of a content item, comprising audio and/or video content, that can be played by a client system, with no accompanying identifier suitable for searching a

database for further information; (ii) process the received portion of the content item to determine an identifier suitable for interrogating a database to determine further information associated with a content item, where the determined identifier comprises a computed hash value; (iii) obtain further information on the content item by using the computer hash value to search a database; and (iv) transmit the additional information to the client system.  (*See, e.g.*, '503 Patent, Ex. G, Claim 1.)

47.     The priority date of the '503 Patent is at least as early as August 23, 2000.  As of that date, it was not well-understood, routine, or conventional among those of skill in the art to transmit from a client device merely a portion of the digital audio data alone (without extraneous auxiliary information) to a server system in order to obtain enhanced content associated with the media. In the prior art, the server device would have also had to dispose additional auxiliary information in the content before transmitting it to the client device.  The server device would then transmit both the auxiliary information and the content to the client device.  The client receiver demultiplexes the auxiliary information from the content and using the auxiliary information to enhance rendering.  (*See* Moulin Decl., Ex. E, ¶ 40 (citing the '503 Patent, Ex. G, 2:5-30).)  This increases the size of the content to be transmitted and requires that the server system knows in advance which additional information is desired in the client system.  As the patent states, this prior art system was not nearly as flexible as the claimed approach.  (*Id.*)

48.     The '503 patent specification also discloses that "watermarks" could be included within the contents of a song and transmitted from a client device to a server system that uses the extracted watermark to identify the additional enhanced content at the server system.  (*See* Moulin Decl., Ex. E, ¶ 41 (citing the '503 Patent, Ex. G, 3:14-17).)  The problem with this

approach is that, unlike the claimed approach, auxiliary information must still be embedded within the audio content. (*Id.*, ¶ 41.)

49.     The '503 Patent recites systems and methods that solve the problem of requiring the insertion of wasteful excess additional information into the content signals and continuously transmitting such from the server system to the client devices whether such information was specifically requested or not. And the '503 Patent also solves the problem of requiring a client device to include auxiliary information to be embedded within the audio content when it is sent to the server.  In fact, no additional information needs to be sent with the content in the claimed system and methods. (*Id.*, ¶ 42.)

50.     There are several technical advantages to using the claimed approach of the '503 Patent.  First, the claimed approach does not require attaching wasteful additional information to the audio and/or video content sent from the server system to the client device as was known and taught in the prior art. (*Id.*, ¶ 43.)  The significant improvement of the claimed systems and methods over the prior art is that the hash values are created from just a portion of the media content itself after receipt at the server system. (*Id.*)  There is no need to manage watermarks and insert anything into the media content. (*Id.*)  Moreover, only a portion of the media content is necessary at the server system to create a hash value identifier. (*Id.*)  The hash value identifier may then be used to access enhanced content in a database such as song titles, artist's names, recording dates, record jacket covers, amongst other items. (*Id.*)  The computation of hash values and their use as identifiers at the server system allows for a much more robust, efficient, and convenient system over the use of prior art systems that required transmission of auxiliary data. (*Id.*)  And computing hash values from the content itself creates simplified data structures. All of the claims of the '503 Patent recite the use of a particular way to access enhanced content

using hash values created from received media content (*i.e.*, the claims do not preempt all ways of accessing and rendering enhanced content).  (*Id.*)

### *The '823 Patent*

51.     The '823 Patent, entitled "Detecting and Measuring Exposure to Media Content Items," was duly and legally issued by the USPTO on November 24, 2009.  A true and correct copy of the '823 Patent is attached hereto as Exhibit H.

52.     Nielsen is the assignee and owner of all right, title, and interest in the '823 Patent. The '823 Patent is valid and enforceable.

53.     The '823 Patent is directed to, among other things, specific technological methods and apparatuses for detecting user exposure to media items using particular configurations of computer servers, server selectors, and storage devices, directed to balancing large loads and handling geographic diversity considerations.  (*See, e.g.*, '823 Patent, Ex. H.)  The claimed system comprises a server for receiving multiple reference media items from one or more media receivers.  (*Id.*, claim 6.)  The claimed system also comprises a stream collection server selector that selects one of multiple data stream collection servers to receive the representation of one or more target media items.  (*Id.*)  This selection is based on at least one of load and geographic proximity to a client device.  (*Id.*)  Multiple stream collection servers receive a representation of at least one target media item from at least one client device.  (*Id.*)  A stream store stores a representation of at least a subset of the received reference media items and stores a representation of the one or more target media items.  (*Id.*)  A correlator server identifies one of the reference media items as corresponding to the target media item.  (*Id.*)  An output device generates signaling showing user exposure to the identified reference media item.  (*Id.*)

54.     The priority date of the '823 Patent is at least as early as August 31, 2004, which is the filing date of one of the provisional applications upon which the '823 Patent is based.  (*See* '823 Patent, Ex. H.)   As of that date (and even as of August 30, 2005, the filing date of the application of the '823 Patent), it was not well-understood, routine, or conventional among those of skill in the art to be able to measure user exposure to media items across various media and content delivery mechanisms, and across multiple geographic zones, without requiring active participation of users.  (*See* Moulin Decl., Ex. E, ¶ 45 (citing the '823 Patent, Ex. H, 1:38-2:17; 3:30-63).)

55.     There are several technical advantages to using the claimed system.  The prior art did not allow for determining overall exposure to particular content such as an advertisement across various media, such as television, radio or other media.  (*See* Moulin Decl., Ex. E, ¶ 46.)   As the patent discloses, the prior art systems and methods were not sufficient to collect and measure a large enough pool of user exposures in order to obtain an overview of aggregate exposure to various media items and types of media items, which is important to advertisers.  (*See* Moulin Decl., Ex. E, ¶ 46 (citing the '823 Patent, Ex. H, 1:38-2:17, 3:30-63).)

56.     The claimed system remedies these deficiencies by providing a platform of hardware and software elements that can serve customers located globally.  Unlike the prior art, media receivers are disclosed that can collect broadcasts from live or prerecorded broadcasts over various media, and can generate digital representations (such as signatures) from these broadcasts.  (*See* Moulin Decl., Ex. E, ¶ 46.)   Given the potential abundance of target media items received from many users listening to or watching large amounts of available content across various media platforms, the claimed system comprises multiple stream collection servers to handle the load so that real time responses can be provided.  (*Id.*)

57.     Prior art systems relying on simple server backends without logic for balancing large loads and geographic diversity considerations may result in unacceptable delays in identifying user exposure.  (*Id.*)  In the '823 Patent, more real time responses are accomplished using a stream collection server selector that selects one of the multiple stream collection servers to receive the representations of user content data (or signatures) based on load balancing and/or geographic location of the user device.  In this manner, the claimed '823 systems elegantly solve the problems of overburdened systems which created excessive delays in determining exposure to media content received from a large number of client devices over multiple geographic locations.  (*Id.*)  The patented solution offers high performance and real time exposure detection of media content received from a large number of client devices over multiple geographic locations without overburdening the system.  (*Id.*)

## THE INFRINGING PRODUCTS

58.     According to its website, ACRCloud provides an "audio recognition platform" for audience measurement, broadcast monitoring, and live channel detection, amongst other things. (*See ACRCloud*, https://www.acrcloud.com/, Ex. A.)  ACRCloud software performs audio content recognition (ACR).  (*See ACRCloud, Advertising & Big Data*, https://www.acrcloud.com/advertising-big-data/, Ex. C.)  The core business of ACRCloud is to perform audio fingerprint-based content identification.  (*See Amazon, AWS Case Study: ACRCloud*, https://aws.amazon.com/cn/solutions/case-studies/acrcloud/, Ex. B.)

59.     In order to provide its audio fingerprint retrieval services, ACRCloud uses the servers and databases associated with Amazon Web Services ("AWS") in the United States and around the world to provide an audio recognition platform.  (*Id.*)  As the Co-Founder of ACRCloud Yin Zhongxing stated, "The global reach of AWS enables our startup to provide

secure, stable, and reliable audio fingerprint retrieval services to customers all over the world."
(*Id.*)

60.     The ACRCloud's systems and methods can be described as follows.  User client devices transmit either (1) fingerprints (generated from audio content) or (2) audio content, to ACRCloud's platform.   An identifier transmitted from the client device to the ACRCloud platform denotes whether audio content items or fingerprints generated from the audio content are being sent to the ACRCloud platform.   When fingerprints are received at the ACRCloud platform, the platform extracts the audio fingerprints.  (*See* ACRCloud "Broadcast Information Monitoring"      document      dated      June      22,      2018,      available      at *http://web.archive.org/web/20190330133859/https://www.acrcloud.com/technologies, March 30, 2019*, attached hereto as Exhibit Q.)   Alternatively, when audio content is received at the ACRCloud platform, either fingerprints can be generated from the audio content at the platform or identifiers such as hash values can be generated from the audio and thereafter used to access enhanced content in databases.

61.     A fingerprint consists of highly discriminative content features. The FAQ page for ACRCloud's      reference      documentation      (*See      ACRCloud*,      *Definition      of      Terms*, https://docs.acrcloud.com/faq/definition-of-terms#terminology, attached hereto as Exhibit I) discloses that the ACRCloud processors and software deploy the methods described in the paper entitled "Quad-Based Audio Fingerprinting Robust to Time and Frequency Scaling" for audio fingerprinting.   (*See* Reinhard Sonnleitner & Gerhard Widmer, *Quad-Based Audio Fingerprinting Robust to Time and Frequency Scaling*, Proceedings of the 17th International Conference of Digital Audio Effects, Erlangen, Germany, Sept. 1-5, 2014 (2014)  (hereinafter, the "Audio Fingerprinting Paper"), attached hereto as Exhibit J.)   The fingerprints are then

compared or matched with the data in ACRCloud's background audio database.  (*See Amazon, AWS Case Study: ACRCloud*, https://aws.amazon.com/cn/solutions/case-studies/acrcloud, Ex. B.)  The results of the matching (the "identification results") are returned.  (*Id*.)  In this manner, ACRCloud matches fingerprints with records in a database identifying media played on user or client devices.  (*Id*.)

62.     According to the Audio Fingerprinting Paper, "audio files are . . . processed with a sampling rate of 16 kHz.  We compute the STFT [frequency domain transform] magnitude spectrogram [indicating the power levels of the various frequency components] using a Hann-window [*i.e.,* frame] of size 1024 samples (64 ms) and a hopsize [*i.e.,* frame overlap] of 128 samples (8 ms), discarding the phases."  (Audio Fingerprinting Paper, Ex. J, P. DAFX-2.)  Moreover, "[s]pectral [power] peaks are local maxima [determined by comparing the power levels of the frequency components] in an STFT magnitude spectrogram."  (*Id.*)  In other words, power levels of frequency components within a single frame are compared to identify a particular spectral peak.  Defendant performs this power level comparison on consecutive overlapping frames.  According to the Audio Fingerprinting Paper, the spectral peak identified through the comparison of spectral power levels within a particular frame (described above) is used as a descriptor.  (*Id.*)  This descriptor, in turn, is used to generate a signature.  (*Id.*)

63.     ACRCloud describes how its products and methods can find out which programs users are watching or listening to on their TVs or mobile devices.  (*See ACRCloud, Live Channel Detection*, https://www.acrcloud.com/live-channel-detection/, attached hereto as Exhibit K.)  Audio content or fingerprints based on audio content is received from an audio/video client source at the ACRCloud system.  (*Id.*)  In the case of receipt of audio content by ACRCloud, audio fingerprints are generated.  (*Id.*)  The system stores and indexes these fingerprints.  (*Id.*)

The audio fingerprints are based on the audio content from the audio/video program that the user is listening to on his or her TV or mobile device. (*Id.*) The ACRCloud system then performs fingerprint matching. (*Id.*) An ACRCloud server provides output consisting of monitoring logs and reports that show client exposure to the referenced media. (*See ACRCloud, Broadcast Information Monitoring*, https://www.acrcloud.com/broadcast-monitoring/, attached hereto as Exhibit L.)

**COUNT I**
**INFRINGEMENT OF THE '889 PATENT**

64.     Nielsen repeats and re-alleges paragraphs 1-63 as if fully set forth herein.

65.     The '889 patent is valid and enforceable.

66.     Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, at least Claims 1, 2, 4, 5, 6, 8, 9, and 11-17 of the '889 Patent ("the '889 Asserted Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, infringing products and by performing infringing methods in the United States. Defendant's activities are without license or permission from Nielsen.

67.     The infringing products and methods include all elements of the '889 Asserted Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Exhibit M.

68.     Defendant has knowledge of the '889 Patent as of the service date of the Complaint, and Defendant is willfully and deliberately infringing the '889 Patent at least as of the service date of this Complaint.

69.    Through the conduct alleged above, Defendant has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

70.    Defendant has also irreparably harmed Nielsen.  Unless and until Defendant is enjoined by this Court from further infringement of the '889 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

### COUNT II
### INFRINGEMENT OF THE '700 PATENT

71.    Nielsen repeats and re-alleges paragraphs 1-70 as if fully set forth herein.

72.    The '700 patent is valid and enforceable.

73.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, at least Claims 1-6, 8-11, and 15-18 of the '700 Patent ("the '700 Asserted Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, infringing products and by performing infringing methods in the United States.  Defendant's activities are without license or permission from Nielsen.

74.    The infringing products and methods include all elements of the '700 Asserted Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Exhibit N.

75.    Defendant has knowledge of the '700 Patent as of the service date of the Complaint, and Defendant is willfully and deliberately infringing the '700 Patent at least as of the service date of this Complaint.

76.     Through the conduct alleged above, Defendant has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

77.     Defendant has also irreparably harmed Nielsen.  Unless and until Defendant is enjoined by this Court from further infringement of the '700 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

**COUNT III**
**INFRINGEMENT OF THE '503 PATENT**

78.     Gracenote repeats and re-alleges paragraphs 1-77 as if fully set forth herein.

79.     Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, at least Claims 1, 5, 6, 8, 9, 10, 12, 16, and 17 of the '503 Patent ("the '503 Asserted Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, infringing products and by performing infringing methods in the United States.  Defendant's activities are without license or permission from Gracenote.

80.     The infringing products and methods include all elements of the '503 Asserted Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Exhibit O.

81.     Defendant has knowledge of the '503 Patent as of the service date of the Complaint, and Defendant is willfully and deliberately infringing the '503 Patent at least as of the service date of this Complaint.

82.     Through the conduct alleged above, Defendant has caused and will in the absence of an injunction continue to cause Gracenote to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

83.    Defendant has also irreparably harmed Gracenote.  Unless and until Defendant is enjoined by this Court from further infringement of the '503 Patent, Gracenote will continue to suffer irreparable injury for which it has no adequate remedy at law.

**COUNT IV**
**INFRINGEMENT OF THE '823 PATENT**

84.    Nielsen repeats and re-alleges paragraphs 1-83 as if fully set forth herein.

85.    Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, at least Claim 6 of the '823 Patent ("the '823 Asserted Claim") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, infringing products in the United States.  Defendant's activities are without license or permission from Nielsen.

86.    The infringing products include all elements of the '823 Asserted Claim, either literally or equivalently, as shown in the claim chart incorporated by reference in this Complaint and attached hereto as Exhibit P.

87.    Defendant has knowledge of the '823 Patent as of the service date of the Complaint, and Defendant is willfully and deliberately infringing the '823 Patent at least as of the service date of this Complaint.

88.    Through the conduct alleged above, Defendant has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

89.    Defendant has also irreparably harmed Nielsen.  Unless and until Defendant is enjoined by this Court from further infringement of the '823 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

22

## PRAYER FOR RELIEF

WHEREFORE, Nielsen and Gracenote pray for judgment against Defendant as follows:

A.      A judgment that Defendant has infringed the Asserted Patents;

B.      A judgment that Defendant's infringement of the Asserted Patents is willful;

C.      An order permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns, from further acts of infringement of the Asserted Patents;

D.      An award of damages adequate to compensate Nielsen and Gracenote for Defendant's infringement of the Asserted Patents, including increased damages up to three times the amount found or assessed, together with pre-judgment and post-judgment interest and costs, under 35 U.S.C. §§ 154(d) and 284;

E.      A judgment that this case is exceptional and an award of Nielsen's and Gracenote's reasonable attorneys' fees, costs, and expenses under 35 U.S.C. § 285; and

F.      An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

OF COUNSEL:

Steven Yovits
Constantine Koutsoubas
Melvin Gaddy
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

Clifford Katz
Jolie Brett Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

Scott Doyle
KELLEY DRYE & WARREN LLP
3050 K Street NW, Suite 400
Washington, DC 20007
Tel:  (202) 342-8400

Dated:  October 12, 2022
10376794 / 14944-00005

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:   */s/ David E. Moore*
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Brandon R. Harper (#6418)
     Carson R. Bartlett (#6750)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com
     bharper@potteranderson.com
     cbartlett@potteranderson.com

*Attorneys for Plaintiffs The Nielsen Company
(US), LLC and Gracenote, Inc.*