## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC; and GRACENOTE, INC. | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 22-1344-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| ACRCLOUD, LTD. | ) ) ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company
(US), LLC and Gracenote, Inc.*

Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant ACRCloud, Ltd.*

Dated: November 10, 2025
12555789 / 14494.00005

# TABLE OF CONTENTS

**page**

I.    INTRODUCTIONS ................................................................................................. 1

    A.    Plaintiff's Opening Introduction ................................................................ 1

    B.    Defendant's Answering Introduction .......................................................... 2

II.   PLAINTIFF'S LEGAL STANDARDS ................................................................. 2

    A.    Means-Plus-Function Claims...................................................................... 2

    B.    Indefiniteness ............................................................................................... 3

III.  AGREED-UPON CONSTRUCTIONS ................................................................ 4

IV.   DISPUTED CLAIM CONSTRUCTIONS ........................................................... 4

    A.    '503 patent .................................................................................................... 4

        1.    Plaintiff's Opening Position ............................................................ 4

        2.    Defendant's Opening Position ........................................................ 6

        3.    Plaintiff's Reply Position ................................................................ 9

            a.    ACRCloud Makes Two Flawed Arguments.................................. 9

            b.    "To Enhance Rendering" Is Not Limiting Because It Adds
                No Structure or Antecedent Basis to the Claims, Thus
                Confirming That the Term Is Merely a Non-Limiting
                Statement of Purpose ................................................................... 12

        4.    Defendant's Sur-Reply Position.................................................... 15

    B.    "an output device, coupled to the correlator server, for generating output
        signaling user exposure to the identified referenced media item" (Claim 6
        of the '823 patent)...................................................................................... 17

        1.    Plaintiff's Opening Position.......................................................... 17

            a.    The "output device" limitation is not a means-plus-function
                claim limitation under 35 U.S.C. § 112, ¶ 6................................. 18

b. The "output device" limitation should be construed as "hardware or software coupled to the correlator server for generating output signaling user exposure to the identified reference media item" ................................................... 19

c. Alternatively, should the Court find the "output device" term is in means plus function form under 35 U.S.C. § 112 ¶ 6, the term is not indefinite because the specification discloses sufficient corresponding structure. ............................. 21

2. Defendant's Answering Position ........................................................... 22

3. Plaintiff's Reply Position ..................................................................... 25

a. The "output device" limitation is not a means-plus-function claim limitation .......................................................................... 25

b. The "output device" limitation should be construed in accordance with its plain and ordinary meaning ......................... 28

4. Defendant's Sur-Reply Position ............................................................ 29

C. "a stream collection server selector, for selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media tem" (Claim 6 of the '823 patent) .................................. 30

1. Plaintiff's Opening Position .................................................................. 31

a. The "stream collection server selector" term is not a means-plus-function limitation ................................................................ 32

b. The "stream collection server selector" limitation should be construed as "a software program, or the computer on which that program runs, for selecting one of the plurality of data signature stream collection servers to receive the representation of at east one target media item, the selecting based on prior requests sent to the plurality of data signature stream collection servers and/or geographic proximity to the client device" .................................................... 33

(1) Nielsen's construction is the plain and ordinary meaning of the "stream collection server selector" term. .............................................................................. 34

(2) Nielsen's proposed construction properly incorporates the meaning of "load". ............................... 35

    c. Alternatively, should the Court find the "stream collection server selector" term is in means plus function form under 35 U.S.C. § 112 ¶ 6, the claim is not indefinite because the specification discloses sufficient corresponding structure........... 37

  2. Defendant's Answering Position ................................................ 38

  3. Plaintiff's Reply Position ......................................................... 41

    a. "Server Selector" is not in means-plus-function form ................. 41

    b. ACRCloud proposes no construction for the "server selector" term, and thus, the Court should adopt Nielsen's characterization of the plain and ordinary meaning .................... 45

  4. Defendant's Sur-Reply Position ................................................ 46

D. "load" (Claim 6 of the '823 patent) ............................................. 48

  1. Defendant's Answering Position ................................................ 48

  2. Plaintiff's Reply Position ......................................................... 50

    a. ACRCloud's proposed construction lacks intrinsic support ........ 51

    b. ACRCloud bases its proposed construction on the wrong technology. .................................................................. 54

  3. Defendant's Sur-Reply Position ................................................ 54

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)....................................................................................51

*Alnylam Pharmaceuticals, Inc. v. Pfizer Inc. et al*,
    No. 1-23-cv-00578, 2024 WL 3742313 (D. Del. Aug. 9, 2024) ...................................8, 11, 12

*In re Aoyama*,
    656 F.3d 1293 (Fed. Cir. 2011)..........................................................................21, 22, 38

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014), overruled on other grounds by *Williamson v.
    Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ........................................................42, 47

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
    919 F.3d 1320 (Fed. Cir. 2019)..............................................................................12

*Bayer Pharma AG v. Watson Labs., Inc.*,
    C.A. No. 12-1726-LPS-CJB, 2014 WL 4954617 (D. Del. Sept. 30, 2014)..............................5

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006).................................................................................7

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
    967 F.3d 1353 (Fed. Cir. 2020)..........................................................................7, 14, 15

*Boston Sci. Corp. v. Cook Grp. Inc.*,
    C.A. No. 15–980–LPS–CJB, 2017 WL 1364205 (D. Del. Apr. 12, 2017) ....................*passim*

*Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001)..........................................................................6, 10, 13

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002).................................................................................5

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
    958 F.3d 1348 (Fed. Cir. 2020)..........................................................................10, 11, 12

*Dyfan, LLC v. Target Corp.*,
    28 F.4th 1360 (Fed. Cir. 2022) .........................................................................19, 33, 45, 48

*E.I. DuPont De Nemours & Co. v. Monsanto Co.*,
    903 F. Supp. 680 (D. Del. 1995)...............................................................................6

*Egenera, Inc. v. Cisco Sys., Inc.*,
    972 F.3d 1367 (Fed. Cir. 2020)......................................................................22

*Eli Lilly and Co. v. Teva Pharma. Int'l GmbH*,
    8 F.4th 1331 (Fed. Cir. 2021) ...............................................................7, 9, 13

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014).................................................................20, 34

*International Gamco, Inc. v. Multimedia Games, Inc.*,
    No. 04-1053, 2009 WL 10664875 (S.D. Cal. Apr. 20, 2009)...........................27-28

*Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*,
    649 F.3d 1350 (Fed. Cir. 2011)......................................................................26

*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003)...............................................................8, 9, 11

*Marrin v. Griffin*,
    599 F.3d 1290 (Fed. Cir. 2010).......................................................................9

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998).................................................................39, 42

*Mass. Inst. Of Tech. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006)............................................................38-39, 41-42

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003)......................................................................21

*MHL Custom, Inc. v. Waydoo USA, Inc.*,
    654 F. Supp. 3d 329 (D. Del. 2023).................................................................9, 10

*Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.*,
    No. 2:19-CV-00514-JDW, 2020 WL 6158233 (E.D. Pa. Oct. 21, 2020)..............................27

*Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*,
    122 F.4th 860 (Fed. Cir. 2024) ......................................................................51

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
    No. 14-CV-03657-SI, 2016 WL 6563343 (N.D. Cal. Nov. 4, 2016) ..............................23, 39

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)................................................................................3

*Osseo Imaging, LLC v. Planmeca USA, Inc.*,
    C.A. No. 17-1386-JFB, 2018 WL 5617544 (D. Del. Oct. 30, 2018)..............................27, 30

*Pacing Technologies, LLC v. Garmin International, Inc.*,
  778 F.3d 1021 (Fed. Cir. 2015)..................................................................8, 30

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  977 F. Supp. 2d 1013 (S.D. Cal. 2013), *aff'd*, 778 F.3d 1021 (Fed. Cir. 2015) ...............27, 30

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)...........................................................1, 6, 10, 12

*Robert Bosch, LLC v. Snap On Inc.*,
  769 F.3d 1094 (Fed. Cir. 2014)...........................................................23, 24, 27, 41

*S3 Inc. v. Nvidia Corporation*,
  259 F.3d 1364 (Fed. Cir. 2001)...........................................................43, 47

*Script Sec. Sols. L.L.C. v. Amazon.com, Inc.*,
  No. 2:15-CV-1030-WCB, 2016 WL 3959804 (E.D. Tex. July 22, 2016).............................23

*Sepracor Inc. v. Dey, L.P.*,
  590 F. Supp. 2d 649 (D. Del. 2008)........................................................43

*Simo Holdings Inc. v. Hong Kong Ucloudlink Network Technology Ltd.*,
  983 F.3d 1367 (Fed. Cir. 2021)...........................................................7, 13, 14

*Skky, Inc. v. MindGeek, s.a.r.l.*,
  859 F.3d 1014 (Fed. Cir. 2017)...........................................................26

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017)...........................................................3

*SPH America, LLC v. AT&T Mobility, LLC*,
  2015 WL 12831674 (S.D. Cal. June 9, 2015)...............................................39, 43

*Symantec Corp. v. Comp. Assocs. Int'l, Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008)...........................................................19, 34

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
  731 F.3d 1336 (Fed. Cir. 2013)...........................................................3, 22, 26, 38

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015)...........................................................5, 10, 14, 15, 16

*TQ Delta, LLC v. Adtran, Inc.*,
  C.A. No. 14-954-RGA, 2018 WL 2002481 (D. Del. Apr. 27, 2018) ........................ 35, 50-51

*TQ Delta, LLC v. CISCO Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019)...........................................................27, 55

*TriPlay, Inc. v. WhatsApp, Inc.*,
　　C.A. No. 13-1703-LPS-CJB, 2016 WL 3574012 (D. Del. June 30, 2016) .................... *passim*

*TwinStrand Biosciences, Inc. v. Guardant Health, Inc.*,
　　C.A. No. 21-1126-GBW-SRF, 2022 WL 17986012 (D. Del. Dec. 29, 2022)........................43

*U.S. Surgical Corp. v. Ethicon, Inc.*,
　　103 F.3d 1554 (Fed. Cir. 1997).......................................................................................48

*United Access Techs., LLC v. AT&T Corp.*,
　　757 F. App'x 960 (Fed. Cir. 2019) .....................................................................................3

*Vitronics Corp. v. Conceptronic, Inc.*,
　　90 F.3d 1576 (Fed. Cir. 1996).........................................................................................52

*Vivint, Inc. v. ADT LLC*,
　　No. 2023-1995, 2024 WL 5074569 (Fed. Cir. Dec. 11, 2024)........................................40, 45

*Weber, Inc. v. Provisur Techs., Inc.*,
　　92 F.4th 1059 (Fed. Cir.), *cert. denied sub nom. Provisur Techs., Inc. v.*
　　*Weber, Inc*, 145 S. Ct. 173 (2024) ..................................................................................40, 45

*Williamson v. Citrix Online, LLC*,
　　792 F.3d 1339 (Fed. Cir. 2015) (en banc)...................................................................... *passim*

*Zeroclick, LLC v. Apple Inc.*,
　　891 F.3d 1003 (Fed. Cir. 2018)......................................................................................27, 42

**Statutes**

35 U.S.C. § 112............................................................................................................. *passim*

35 U.S.C. § 112(f).......................................................................................................22, 39, 43

**TABLE OF EXHIBITS**

**EXHIBITS TO JOINT APPENDIX ("JA")**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Expert Declaration of Professor Michael Mitzenmacher |
| 1-A | Michael Mitzenmacher *Curriculum Vitae* |
| 1-B | Owen Garrett, NGINX and the "Power of Two Choices" Load-Balancing Algorithm, F5 (Nov. 12, 2018), https://www.f5.com/company/blog/nginx/nginx-power-of-two-choices-load-balancing-algorithm |
| 2 | U.S. Patent No. 7,904,503 |
| 3 | U.S. Patent No. 7,623,823 |
| 4 | KARL KOPPER, LINUX ENTERPRISE CLUSTER: BUILD A HIGHLY AVAILABLE CLUSTER WITH COMMODITY HARDWARE AND FREE SOFTWARE (2005) (excerpt) |
| 5 | William Buchanan, *Input/Output*, *in* MASTERING PASCAL AND DELPHI PROGRAMMING (1998) (excerpt) |
| 6 | *Output device*, A DICTIONARY OF COMPUTING (6th ed. 2008), at https://www.oxfordreference.com/display/10.1093/oi/authority.2011 0803100257600?p=emailA/xLLGUvT3bdA&d=/10.1093/oi/authorit y.20110803100257600&print |
| 7 | *Output device*, TechTerms.com, The Computer Dictionary, Output Device, at https://techterms.com/definition/outputdevice |
| 8 | *Output device*, The Computer Dictionary of Information Technology, at https://www.computer-dictionary-online.org/definitions-o/output-device.html |
| 9 | Jingsha He, *An architecture for wide area network load balancing*, in IEEE Int'l Conference on Communications (2000) |
| 10 | Xubin He & Qing Yang, Performance Evaluation of Distributed Web Server Architectures under E-Commerce Workloads 285-292 (Int'l Conference on Internet Computing 2000) |
| 11 | Thomas Sandholm, *Object Caching in a Transactional, Object-Relational CORBA Environment* (Stockholm University 1998), at https://shiftleft.com/mirrors/www.hpl.hp.com/personal/Thomas_San dholm/sandholm1998.pdf (excerpt) |
| 12 | Valeria Cardellini et al., *DNS dispatching algorithms with state estimators for scalable Web-server clusters*, 2 World Wide Web 101 (1999) |
| 13 | Yongbing Zhang et al., *Comparison of dynamic and static load-balancing strategies in heterogeneous distributed systems*, 144-2 IEE Proc. Comput. Digit. Tech. 100 (1997) |
| 14 | Wikipedia, the Free Encyclopedia, *Load balancing (computing)*, at https://en.wikipedia.org/wiki/Load_balancing_(computing) |
| 15 | TONY BOURKE, SERVER LOAD BALANCING (2001) (excerpt) |

| 16 | *Server Definition*, LINUX INFORMATION PROJECT (May 16, 2005), https://www.linfo.org/server.html |
| 17 | Jeffery Westbrook, Load balancing for response time, 35 J. of Algorithms 35 1, Abstract (2000) (received July 26, 1995) |
| 18 | Academic Press Dictionary of Science and Technology (1992), p. 622 |
| 19 | Declaration of Dr. David Anderson in Support of Defendant's Answering Claim Construction Brief |
| 19-1 | David V. Anderson *Curriculum Vitae* |
| 20 | The Computer Glossary (2001) at p. 225 |
| 21 | Academic Press Dictionary of Science and Technology (1992), p. 1949 |
| 22 | Tony Bourke, Server Load Balancing (2001) (excerpt) |

# I.    INTRODUCTIONS

## A.    Plaintiff's Opening Introduction

The parties respectfully ask the Court to construe three terms across two patents: 7,904,503 (the '503 patent) and 7,623,823 (the '823 patent),[1] both of which describe techniques used in the audience measurement field. The '503 patent describes obtaining additional information about a content item using only a portion of the content item to generate a "hash value," which is used to look up the additional information about the content item from a database. The '823 patent describes detection of user exposure to media by matching received "target media item[s]" to "reference media items" in a server system.

The parties dispute whether the preambles of certain independent claims of the '503 patent are limiting. But far from reciting structure or otherwise "giving life" to the claims, those preambles merely identify the purpose of the claims. (*See, e.g.,* JA, Ex. 2, '503 patent, claim 1 ("A method to enhance rendering of a content item, the method comprising").) Accordingly, the Court should find that the preambles are ***not*** limiting. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (holding preambles non-limiting because they "offer no distinct definition of any of the claimed invention's limitations, but rather merely state[] . . . the purpose or intended use of the invention.").

In addition, the parties dispute whether two limitations in the asserted claim of the '823 patent should be treated as "means-plus-function" limitations—and if so, whether the specification discloses enough corresponding structure to make the limitations sufficiently definite. Because the limitations do not use the word "means," and because those limitations contain common technical terms with known meanings, the Court should ***not*** give them means-

---

[1] The parties do not dispute the construction of any term in the third patent in suit, U.S. 8,065,700.

plus-function treatment. And even if the limitations were in means-plus-function form, the specification identifies more than sufficient corresponding structure.

### B.    Defendant's Answering Introduction

ACRCloud disagrees with the argument and characterization of the issues set forth in Nielsen's introduction, but rather than burden the Court with repetitive argument or discussions of an overall theme, ACRCloud will address Nielsen's points in-context for each term,

## II.    PLAINTIFF'S LEGAL STANDARDS

### A.    Means-Plus-Function Claims

"Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes [pre-AIA] 35 U.S.C. § 112, para. 6," which recites as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–48 (Fed. Cir. 2015) (en banc); pre-AIA 35 U.S.C. § 112, ¶ 6. "In enacting this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Id*. (citing *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003).

The Federal Circuit has consistently held that there is a presumption against the application of § 112, ¶ 6 for limitations that do not contain the word "means." *Williamson,* 792

F.3d at 1347. This presumption can be overcome only when the claim term recites "function without reciting sufficient structure for performing that function." *Id.* at 1349.

### B.     Indefiniteness

The definiteness requirement of 35 U.S.C. § 112 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A patent challenger has the burden of proving indefiniteness by clear and convincing evidence. *See United Access Techs., LLC v. AT&T Corp.*, 757 F. App'x 960, 968-69 (Fed. Cir. 2019); *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). When courts make findings that particular claim limitations are not subject to treatment under § 112, ¶ 6, those limitations are typically found to be sufficiently definite. *Boston Sci. Corp. v. Cook Grp. Inc.*, C.A. No. 15–980–LPS–CJB, 2017 WL 1364205, at *7 (D. Del. Apr. 12, 2017) ("Indeed, the Court is not aware of any instance in which a term survived scrutiny under the first step of the Section 112, paragraph 6 analysis, but was still found to have fallen short of the requirements of Section 112, paragraph 2."); *TriPlay, Inc. v. WhatsApp, Inc.*, C.A. No. 13-1703-LPS-CJB, 2016 WL 3574012, at *10 (D. Del. June 30, 2016) ("Having concluded that [a disputed term] connotes sufficient structure to a person of ordinary skill in the art to avoid application of Section 112, paragraph 6, the Court is hard-pressed to find some reason why the term would be otherwise indefinite pursuant to Section 112, paragraph 2."). And when a claim is subject to interpretation under § 112, ¶ 6, the claim is indefinite only when "the [specification] fails to disclose adequate corresponding structure" to provide sufficiently definite meaning to persons of ordinary skill in the art. *Williamson*, 792 F.3d at 1349, 1352. "The party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1349

3

(Fed. Cir. 2013) (citing *Budde v. Harley–Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III.     AGREED-UPON CONSTRUCTIONS

The parties have agreed to the following construction which the Court and jury may find helpful in understanding the asserted claims:

| Claim and Patent | Term | Agreed Construction |
|---|---|---|
| 12, '503 patent | A server system to facilitate enhanced rendering of a content item, the system comprising:<br><br>a receiver to receive…<br><br>a processor to process…<br><br>a lookup component to obtain further information… | The "lookup component" is not required to be part of the claimed processor. |

## IV.     DISPUTED CLAIM CONSTRUCTIONS

### A.     '503 patent

| Term | Nielsen Proposal | ACRCloud Proposal |
|---|---|---|
| "A method to enhance rendering of a content item, the method comprising" (Claim 1, preamble)<br><br>"A server system to facilitate enhanced rendering of a content item, the system comprising" (Claim 12, preamble)<br><br>A method to enhance rendering of a content item, the method comprising (Claim 23, preamble) | Preamble is not limiting. | Preamble is limiting. |

### 1.     Plaintiff's Opening Position

The sole claim construction dispute pertaining to the '503 patent is whether the preambles of claims 1, 12, and 23 are limiting. The Court should hold that they are not.

A preamble only limits a claim "if it recites essential structure or steps, or if it is necessary to give life, meaning and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Accordingly, "[i]t is well settled that 'a preamble is not limiting where a patentee defines a structurally complete invention in the claim body.'" *Bayer Pharma AG v. Watson Labs., Inc.*, C.A. No. 12-1726-LPS-CJB, 2014 WL 4954617, at *7 n.8 (D. Del. Sept. 30, 2014) (quoting *Catalina Mktg.*, 289 F.3d at 808).

The preambles of claims 1, 12, and 23 of the '503 patent are non-limiting because they do not recite any structure or steps at all, let alone "essential" ones. *See Catalina Mktg.*, 289 F.3d at 808. The preambles simply declare that the claimed system and methods are "to enhance rendering." Rather than reciting structure or steps in the preambles, these claims recite robust and complete structure of the system claim and all steps of the method claims in the body of the claims. *See* JA, Ex. 2, 10:7-27; 10:57-11:11; 12:26-46. Thus, the bodies of claims 1, 12, and 23 describe "structurally complete invention[s] such that deletion of the preamble phrase does not affect the structure or steps[,]" and the Court should find that the preambles are not limiting. *Catalina Mktg.*, 289 F.3d at 809 (citation omitted).

Nor do the preambles "give life" to these claims. Indeed, the preambles contain no more than standard language indicating the use of the invention. (JA, Ex. 2, claim 1 ("A method to enhance rendering of a content item, the method comprising"), claim 12 ("A server system to facilitate enhanced rendering of a content item, the system comprising"), claim 23 ("A method to enhance rendering of a content item, the method comprising"). Both the Federal Circuit and this District have held that preambles containing such standard purpose-explaining language do ***not*** "give life" to the claims. *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1324 (Fed. Cir. 2015) (finding preambles non-limiting when they use "language stating a purpose or intended use and

employ[ing] the standard pattern of such language: the words 'a method for a purpose or intended use comprising,' followed by the body of the claim, in which the claim limitations describing the invention are recited."); *Pitney Bowes*, 182 F.3d at 1305 (Fed. Cir. 1999) (holding preambles non-limiting because they "offer no distinct definition of any of the claimed invention's limitations, but rather merely state[] . . . the purpose or intended use of the invention.").

The Federal Circuit and this District have explained that a preamble gives life to a claim only where "without the preamble, the language of [recited claim limitations] is meaningless" or where the preamble changes the way the steps of the claim are performed. *E.I. DuPont De Nemours & Co. v. Monsanto Co.*, 903 F. Supp. 680, 696 (D. Del. 1995); *Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001). This stands in direct contrast to the claims 1, 12, and 23 here, which are complete and readily understood without their preambles. "Enhanc[ing]" the rendering of a content item (as recited in the preambles of the asserted claims) has no bearing on a POSITA's ability to carry out the method of receiving, processing, obtaining, and transmitting information (claim 1) or detecting and responding to an indication of user interest, and then processing, obtaining, and transmitting information (claim 23). Nor does it bear on whether a system contains a receiver, a processor, and a lookup component that allow a POSITA to carry out the steps recited in the body of claim 12. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 17, 19, 21.

Thus, the Court should find that the preambles of claims 1, 12, and 23 are not limiting.

### 2.    Defendant's Opening Position

There is only one dispute as to this term: whether each preamble is limiting. ACRCloud respectfully requests that the Court hold that the preambles of claims 1, 12, and 23 of the '503

6

patent are limiting because they give meaning and provide the antecedent basis to the body of the claim.

First, the preambles recite an essential element of the claimed invention, "a content item," which is repeatedly referenced in the body of the claim.

> receiving, at a server system, a portion of ***the content item*** that can be played by a client system from the client system, the received portion of ***the content item*** being distinct from an identifier associated with the content item, ***the content item*** comprising audio and/or video content, the portion of ***the content item*** is not accompanied by an identifier suitable for interrogating a database to determine further information associated with ***the content item***; processing, at the server system, the received portion of ***the content item*** to determine, from the received portion of ***the content item***, the identifier associated with ***the content item*** suitable for interrogating a database to determine further information associated with ***the content item***, the processing comprising computing a hash value for the received portion of ***the content item***, the determined identifier comprising the computed hash value;
> obtaining further information on ***the content item*** using the determined identifier, the obtaining comprising searching the database using the computed hash value; and

'503 patent at claim 1 (emphasis added); *see also* claims 12 and 23; *Bicon, Inc. v. Straumann Co.*, 441 F. 3d 945, 952 (Fed. Cir. 2006) (preamble was limiting because it "recites essential elements of the invention."); *Eli Lilly and Co. v. Teva Pharma. Int'l GmbH*, 8 F. 4th 1331, 1341 (Fed. Cir. 2021).

In other words, this essential structure ("a content item") in the preamble provides the necessary antecedent basis to the body of the claim, which repeatedly recites "*the* content item," thus rendering the preamble limiting. *See Simo Holdings Inc. v. Hong Kong Ucloudlink Network Technology Ltd.*, 983 F.3d 1367, 1375-76 (Fed. Cir. 2021) ("We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim.") (quoting *In re Fought,* 941 F.3d 1175, 1178 (Fed. Cir. 2019); *Bio-Rad Labs., Inc. v. 10X Genomics Inc.,* 967 F.3d 1353, 1371 (Fed. Cir. 2020) (body's reliance on preamble for antecedent basis "is a

strong indication that the preamble acts as a necessary component of the claimed invention");
*Pacing Technologies, LLC v. Garmin International, Inc.,* 778 F.3d 1021, 1023-24 (Fed. Cir. 2015)
(preamble of a statement of intended use—"[a] repetitive motion pacing system for pacing a
user"—was limiting because the term "user" in the preamble provided antecedent basis for that
term later in the body of the claim).

Second, the preamble here is limiting because it recites an intentional purpose for which
the methods must be performed, not merely a statement of effect. *See Jansen v. Rexall Sundown,
Inc.,* 342 F.3d 1329, 1332-33 (Fed. Cir. 2003) (preamble "is therefore not merely a statement of
effect that may or may not be desired or appreciated. Rather, it is a statement of the intentional
purpose for which the method must be performed.") It is this exact intentional purpose that gives
meaning or vitality to the claimed invention and thus makes the preamble limiting. *See Alnylam
Pharmaceuticals, Inc. v. Pfizer Inc. et al*, No. 1-23-cv-00578, 2024 WL 3742313 at *3 (D. Del.
Aug. 9, 2024) (finding preamble limiting because "[t]he purpose or intended use of something is
the very reason for which that something is made or done. What could say more about the life,
meaning, and vitality of a claimed invention than the claimed purpose or intended use of the
invention?")

The title of the '503 patent, "Method of enhancing rendering of content item," shows that
the intentional purpose of the claimed invention is "enhancing rendering of content intent" as set
forth in the preambles. The patent specification discloses how to "enhance the presentation of the
digital audio data for the user, e.g. by presenting the title and artist's name when playing the
audio," and the body of the claim recites how to locate this information (querying database and
using hash value) to enhance the "content item." *See* '503 patent at 2:13-15, 10:7-23. Because
claims here are directed to methods of using and manipulating the "content item," analysis of

statements of intentional purpose in such methods has tended to result in a conclusion that such preamble language is limiting. *See Eli Lilly and Co.*, 8 F. 4th at 1341; *Jansen,* 342 F.3d at 1332-33 (the preamble of a method "for treating or preventing macrocytic-megaloblastic anemia" was limiting because it "set[] forth the objective of the method, and the body of the claim directs that the method be performed on someone 'in need.'").

### 3.    Plaintiff's Reply Position

The parties' sole claim construction dispute with regard to the '503 patent is whether the phrases "to enhance rendering" and "to facilitate enhanced rendering" (collectively, the "to enhance rendering" terms) in the preambles of claims 1 ("A method to enhance rendering of a content item, the method comprising:"), 12 ("A server system to facilitate enhanced rendering of a content item, the system comprising:"), and 23 ("A method to enhance rendering of a content item, the method comprising:") are limiting. There is no dispute that the term "content item" in the preambles is limiting.[2]

There is a "presumption against reading a statement of purpose in the preamble as a claim limitation," and for the reasons set forth below, ACRCloud has not overcome that presumption for the "to enhance rendering" term. *See Marrin v. Griffin*, 599 F.3d 1290, 1294-95 (Fed. Cir. 2010); *MHL Custom, Inc. v. Waydoo USA, Inc.*, 654 F. Supp. 3d 329, 340 (D. Del. 2023).

#### a.    ACRCloud Makes Two Flawed Arguments

ACRCloud makes two flawed arguments about the preambles of the '503 patent. First, ACRCloud asserts that the presence of one limiting term ("content item") in the preambles means that the entirety of the preambles must be limiting.[3] But such argument is inconsistent

---

[2] The remaining term in the preambles, "content item," provides the antecedent basis for the same term in the bodies of the claims, and thus, it is undisputedly limiting.

[3] This is not the case for claim 23, which recites "*a* content item" in the body of the claim. JA, Ex. 2, '503 patent, 12:26 (emphasis added). Thus, even if the Court were to accept ACRCloud's

with the Federal Circuit's holding that "[a] conclusion that some preamble language is limiting does not imply that other preamble language, or the entire preamble, is limiting." *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020) (citing *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322-23 (Fed. Cir. 2015)). And second, ACRCloud incorrectly argues that a preamble term that merely states the purpose of the claim is limiting. But this argument, too, contradicts Federal Circuit law. *See Pitney Bowes Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (holding preambles non-limiting because they "offer no distinct definition of any of the claimed invention's limitations, but rather merely state[] . . . the purpose or intended use of the invention.").

There are several Federal Circuit cases that discredit both of ACRCloud's flawed arguments (each of them rejecting both of those arguments). Specifically, when considering preambles that contain (1) a portion stating the purpose of the claim, and (2) a term that serves as the antecedent basis for a word appearing in the body of the claim, the Federal Circuit has consistently found the portion stating the purpose of the claim non-limiting (even when the antecedent basis term is limiting). *See e.g.*, *Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001) (dividing a preamble reciting "[a] method for reducing hematologic toxicity in a cancer patient" into the non-limiting term "for reducing hematologic toxicity" and the limiting, antecedent-basis-providing term "patient"); *TomTom*, 790 F.3d at 1322-23 (dividing a preamble reciting a "method for generating and updating data for use in a destination tracking system of at least one mobile unit" into the non-limiting term "for generating

---

incorrect argument as to claims 1 and 12—that the presence of one limiting term in the preambles means that the entirety of the preambles is limiting—there is no basis for finding that the preamble limits claim 23. *See MHL*, 654 F. Supp. 3d at 340 ("I do not believe that the presumption against reading a preamble as non-limiting is overcome just because the same preamble is limiting [in a different claim]).

and updating data" and the limiting remainder of the preamble). Accordingly, the Court should find that the term "to enhance rendering," which merely states the purpose of the claim, is non-limiting—even though another preamble term ("content item") provides an antecedent basis and is limiting. *Cochlear*, 958 F.3d at 1355.

ACRCloud relies on *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329 (Fed. Cir. 2003), for the incorrect proposition that preamble terms stating "the intentional purpose" of their claims are limiting. Contrary to ACRCloud's argument, the *Jansen* case does not stand for a rule that preamble terms are limiting if they are purpose-stating terms. *Jansen* concerned a claim with a preamble reciting "a method of treating or preventing macrocytic-megaloblastic anemia in humans." *Jansen*, 342 F.3d at 1333. The body of the claim contained the term "human in need thereof," which the court found depended on the preamble to identify the human's "need," *i.e.*, treating or preventing anemia. *Janson*, 342 F.3d at 1333. In part for this reason, the court found the preamble to be limiting. In contrast, the "to enhance rendering" term in the present case has no such relationship with the claim's body. Moreover, the *Jansen* court also found the disputed preamble phrases limiting because those phrases were "added to gain allowance of the claims after almost twenty years of repeated unsuccessful attempts to gain allowance of claims without those phrases." *Jansen*, 342 F.3d at 1333. That is not true here.

ACRCloud also relies on *Alnylam Pharmaceuticals, Inc. v. Pfizer Inc.*, C.A. No. 23-578-CFC, 2024 WL 3742313 (D. Del. Aug. 9, 2024) for the incorrect proposition that a preamble term's statement of the claim's purpose renders it limiting. *See* Ans. Br. at 8 (citing *Alnylam*, 2024 WL 3742313, at *3). But that was not the holding of the case. In *Alnylam*, Judge Connelly—after stating his displeasure (expressed in the portion of the opinion that ACRCloud quotes) that the Federal Circuit does ***not*** find statements of purpose to be limiting—found the

11

term "vaccine" limiting. But there, "vaccine" provided both an antecedent basis and a structural limitation for the claim. *See Alnylam*, 2024 WL 3742313, at \*2-4. In the present case, unlike *Alnylam*, "to enhance rendering" provides neither an antecedent basis nor a structural limitation.[4]

> b.    "To Enhance Rendering" Is Not Limiting Because It Adds No Structure or Antecedent Basis to the Claims, Thus Confirming That the Term Is Merely a Non-Limiting Statement of Purpose

The Federal Circuit has "long ruled that a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328-29 (Fed. Cir. 2019). Accordingly, a preamble that "states only an intended use, adds no structural element, and provides no antecedent basis for the body of the claims, is not limiting." *Cochlear*, 958 F.3d at 1355.

Here, "to enhance rendering" adds no structure or antecedent basis to the claims—further confirming that the term serves no purpose other than a non-limiting statement of the claims' purpose. Indeed, if "to enhance rendering" were not in the claims, none of the method claims' recited steps would be performed any differently, and none of the apparatus claims' recited structures would change. For example, in performing the method of Claim 1, a portion of a content item would still be received at a server, a hash value would still be computed for the content item, a database would still be searched for the computed hash value, and information would still be transmitted to the client's system. *See* '503 patent, Claim 1. None of the steps of the claim would be changed in any way by the absence of the "to enhance rendering" term. *See*

---

[4] The only other intrinsic evidence related to "enhancing rendering" that ACRCloud identifies is the title of the patent, which cannot provide a basis to read any portion of the preamble as limiting. *See Pitney Bowes*, 182 F.3d at 1312 (discussing the "near irrelevancy of the patent title to claim construction" and holding "if we do not read limitations into the claims from the specification that are not found in the claims themselves, then we certainly will not read limitations into the claims from the patent title.").

*id.* A similar analysis applies to the apparatus of Claim 12 and the method of Claim 23. Thus, the term is non-limiting. *See Bristol-Myers*, 246 F.3d at 1375 ("The steps of the three-hour infusion method are performed in the same way regardless whether or not the patient experiences a reduction in hematologic toxicity ….").

ACRCloud improperly relies on *Eli Lilly & Co. v. Teva Pharmaceuticals Int'l GmbH*, 8 F.4th 1331 (Fed. Cir. 2021), a case in which—unlike the present case—the claimed methods would ***not*** be "performed in the same way regardless of the intended purpose." *Id.* at 1342 (citing *Bristol-Myers*, 246 F.3d at 1375). The claim at issue in *Eli Lilly* recited as follows:

> 1.  A method ***for reducing incidence of or treating at least one vasomotor symptom*** in an individual, comprising
>
>     administering to the individual ***an effective amount*** of an anti-CGRP antagonist antibody, wherein said anti-CGRP antagonist antibody is a human monoclonal antibody or a humanized monoclonal antibody.

*Id.* at 1335 (emphasis added).

The Federal Circuit found the preamble term "for reducing incidence of or treating at least one vasomotor symptom" limiting because it "provide[d] the only metric by which one practicing the claim could determine whether the amount administered is an 'effective amount' … because an 'amount' of anti-CGRP antagonist antibodies that is 'effective' for treatment of vasomotor symptoms may not be—and likely is not—the same amount that would be effective for treatment of other conditions." *Id.* at 1342. Unlike this case, the *Eli Lilly* method would ***not*** be performed the same way if the preamble term "effective amount" were not recited. *Id.*

ACRCloud also cites cases in which the Federal Circuit found preamble terms limiting because, unlike the present case, they provided structure. For example, in *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367 (Fed. Cir. 2021)*,* the preamble recited as follows: "A wireless communication client or extension unit comprising a plurality of

13

memory, processors, programs, communication circuitry, authentication data stored on a subscribed identify module (SIM) card and/or in memory and non-local calls database." *Id.* at 1375. As the Federal Circuit noted, this preamble "contains the only language in the claim that identifies physical components of the claimed physical device." *Id.* Accordingly, "[i]n supplying the only structure for the claimed apparatus, the preamble language supplies 'essential structure,' and the body does not define 'a structurally complete invention.'" *Id*. In contrast, as explained above, "to enhance rendering" is purely a statement of purpose and does not supply any structure. *See id.* at 1376 & n.3 (distinguishing structural terms from "preamble statement[s] of intended use").

Finally, ACRCloud also relies on *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353 (Fed. Cir. 2020). There, the Federal Circuit found the entirety of the phrase "conducting a reaction in plugs in a microfluidic system" limiting where the terms "reaction" and "microfluidic system" provided antecedent bases. *Bio-Rad*, 967 F.3d at 1370-71. The *Bio-Rad* court explained that the entire preamble phrase was limiting because of the relationship between these specific structural components and the drafter's choice to use the preamble to recite a step in the method claim ("conducting"). *Id.* ("[I]t is clear the claim drafters intended to limit the claimed methods to on-chip reactions, using both the preamble and the body of the claim to define the claimed invention"). In fact, the *Bio-Rad* court distinguishes the preamble at issue in that case, where terms providing antecedent basis are "intertwined with the rest of the preamble," from the partially-limiting preamble in *TomTom,* where the preamble was "neatly packaged into two

separate portions." *Id.* Here, like *TomTom*, "to enhance rendering" is readily separable from "a content item," and "to enhance rendering" does not provide any steps or structure for the claims.[5]

Because ACRCloud has not overcome the presumption that a statement of purpose in a preamble is not limiting, the Court should find that "to enhance rendering" is not limiting.

### 4.    Defendant's Sur-Reply Position

Nielsen concedes that "[t]here is no dispute that the term 'content item' in the preambles is limiting." (Reply Br. at 9.) The remaining dispute, therefore, is whether the rest of the language in the preambles are limiting, or if they can be selectively ignored.

The Federal Circuit's *Bio-Rad* opinion cited by the parties is instructive. There, the question was whether the district court erred by "splicing" the preamble into limiting and non-limiting portions. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371-72 (Fed. Cir. 2020). The Federal Circuit refused because "the preamble . . . cannot be neatly packaged into two separate portions." *Id*. It held that the entire preamble at issue, "[a] method for conducting a reaction in plugs in a microfluidic system," was limiting, where "[t]he language relied upon for antecedent basis in the preamble at issue is intertwined with the rest of the preamble." *Id*. at 1361, 1371. In reaching its conclusion, the Federal Circuit distinguished the disputed preamble in the *TomTom* case, which, in contrast, could be "neatly packaged into two separate portions":

| *TomTom* preamble | *Bio-Rad* preamble |
|---|---|
| [1] [a] method for generating and updating data [2] for use in a destination tracking system of at least one mobile unit comprising ...." <br><br> *Portion [1] = non-limiting* | [a] method for conducting a reaction in plugs in a microfluidic system, comprising the steps of .... |

---

[5] While acknowledging that the prosecution history was "not dispositive," the *Bio-Rad* court also relied on the fact that the examiner had amended the preamble to include the phrase "in plugs in the microfluidic system" as a condition of allowing the claims. *Bio-Rad*, 967 F.3d at 1371, n.4. No such amendment occurred for the "to enhance rendering" term in the present case.

| *Portion [2] = limiting* | *Entire preamble limiting because not "neatly packaged into two separate portions"* |
|---|---|

*Id*. at 1370-71.

Here, the entire preambles, including "content item," are limiting because they cannot be "neatly packaged into two separate portions" like the preamble at issue in *TomTom*. The Court should not adopt Nielsen's position, which would "splice" the preamble and render it unintelligible and divorced from the body of the claims:

**Nielesen's erroneous construction renders preambles unintelligible**

| **'503 Patent - Preambles** |
|---|
| "A method ~~to enhance rendering~~ of a content item, the method comprising" (Claim 1, preamble) |
| "A server system ~~to facilitate enhanced rendering~~ of a content item, the system comprising" (Claim 12, preamble) |
| "A method ~~to enhance rendering~~ of a content item, the method comprising" (Claim 23, preamble) |

As shown above, adopting Nielsen's proposed constructions would erroneously construe the "content item" as performing the claimed method steps (as opposed to having method steps performed on it), and as somehow having its own "server system." Therefore, the Court should construe the entire preamble as limiting because Nielsen's proposal would change the meaning of the preamble entirely and in a way that is inconsistent with the body of the claims and the '503 patent specification.

**B.**    **"an output device, coupled to the correlator server, for generating output signaling user exposure to the identified referenced media item" (Claim 6 of the '823 patent)**

| Term | Nielsen Proposal | ACRCloud Revised Proposal |
|---|---|---|
| "an output device, coupled to the correlator server, for generating output signaling user exposure to the identified reference media item" (claim 6) | Plain and ordinary meaning, i.e., hardware or software for generating output signaling user exposure to the identified reference media item; this is not a means plus-function element Alternatively, if the Court decides that the element is in means-plus-function form:<br><br>• The function is "generating output signaling user exposure to the identified reference media item"<br><br>• The corresponding structure is "analytical reporting server 119" as described at 10:51-62, and FIGS. 1 and 3 | Means-plus-function<br>• Function: "generating output signaling user exposure to the identified reference media item"<br><br>• Corresponding structure: "analytical reporting server 119" as described at 10:51-62, and FIGS. 1 and 3. |

**1.    Plaintiff's Opening Position**

ACRCloud contends that "an output device, coupled to the correlator server, for generating output signaling user exposure to the identified reference media item" (the "output device" limitation) is written in means-plus-function form, requiring interpretation under pre-AIA 35 U.S.C. § 112, ¶ 6. But the term "output device" is itself a "recital of structure" for performing the claimed function, and § 112, ¶ 6 does not apply. *See* pre-AIA 35 U.S.C. § 112, ¶ 6 (indicating that § 112, ¶ 6 applies when a claim is expressed "as a means or step for performing a specified function *without the recital of structure*") (emphasis added); *Williamson*, 792 F.3d at 1347 ("Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed *rather than reciting structure for performing that function*."

17

(emphasis added). Instead, this limitation should be construed in accordance with its plain and ordinary meaning: "hardware or software for generating output signaling user exposure to the identified reference media item."

ACRCloud further contends that the limitation is indefinite. As explained above, a court's finding that § 112, ¶ 6 does not apply strongly indicates that the limitation is sufficiently definite. *See Boston Sci.*, 2017 WL 1364205, at \*7; *TriPlay*, 2016 WL 3574012, at \*10. And even if the Court were to hold that this claim limitation should be interpreted under § 112, ¶ 6 (which it should not), the specification recites sufficient corresponding structure, and thus, the term is not indefinite.

        a.    The "output device" limitation is not a means-plus-function claim limitation under 35 U.S.C. § 112, ¶ 6.

The "output device" limitation does not use the word "means," and thus, there is a presumption that it is not subject to 35 U.S.C. § 112, ¶ 6. *Williamson*, 792 F.3d at 1348. To overcome this presumption, ACRCloud would have to show "that the claim term fails to 'recite[] sufficiently definite structure'" *Id.* at 1349 (quoting *Watts*, 232 F.3d at 880). ACRCloud cannot make such a showing.

The term "output device" is itself recitation of structure that is sufficiently definite to be understood by a person of ordinary skill in the art (a "POSITA"). *Williamson*, 792 F.3d at 1349 ("The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning …."). In particular, a POSITA would recognize that an "output device… for generating output" refers to a hardware or software that generates output, such as a server, a display (*e.g.*, a computer monitor), a printer, a hard disk, and the like. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 24-26; JA, Ex. 4, Kopper 2005 at 5; JA, Ex. 5, Buchanan 1998 at 10 (output devices include "displays, printers, hard-disks, and so on"). Accordingly, a

18

POSITA would readily understand that the "output device" limitation connotes definite structure such that § 112, ¶ 6 is inapplicable. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 24, 32, 34; *see Dyfan*, 28 F.4th at 1366 ("In cases where it is clear that a claim term itself connotes some structure to a person of ordinary skill in the art, 'the presumption that § 112, ¶ 6 does not apply is determinative' in the absence of 'more compelling evidence of the understanding of one of ordinary skill in the art.'") (quoting *Apex Inc. v. Raritan Comput., Inc*., 325 F.3d 1364, 1373 (Fed. Cir. 2003).

Given this evidence showing that an "output device" recites structure readily understood by a POSITA, ACRCloud cannot overcome the presumption that that term is not in means form.

> b.    The "output device" limitation should be construed as "hardware or software coupled to the correlator server for generating output signaling user exposure to the identified reference media item"

The specification of the '823 patent does not assign any special definition to the "output device" term, and thus, the Court should "construe [this term] according to [its] ordinary meaning." *Symantec Corp. v. Comp. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008). That plain and ordinary meaning is "hardware or software for generating output signaling user exposure to the identified reference media item."[6]

Nielsen's proposed construction is consistent with numerous dictionaries and technical sites that define "output device" as hardware running software. *See*, *e.g.*, JA, Ex. 6, A DICTIONARY OF COMPUTING (6th ed. 2008) (defining "output device" as "[a]ny device that converts the electrical signals representing information within a computer into a form that can exist or be sensed outside the computer")); JA, Ex. 7, https://techterms.com/definition/outputdevice (defining "output device" as "[a]ny device that

---

[6] ACRCloud offers no construction for this term at all.

outputs information from a computer"); JA, Ex. 8 https://www.computer-dictionary-online.org/definitions-o/output-device.html (defining "output device" as "[e]lectronic or electromechanical equipment connected to a computer and used to transfer data out of the computer"). Thus, a POSITA would understand that (1) the term "output device" identifies hardware or software that convert internal computer information to a form recognizable outside of the computer, and (2) that Nielsen's proposed construction of the "output device" limitation ("hardware or software for generating output signaling user exposure to the identified reference media item.") is the plain and ordinary meaning. *See* Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 23, 27-33.

Nielsen's construction is further supported by the fact that it closely adheres to the specification of the '823 patent. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Specifically, the specification identifies "output" in the form of reports describing exposures to particular media items identified based on the content of collected audio samples. *See*, *e.g.*, JA, Ex. 3, '823 patent, FIGS. 1, 2, 4; *see also id*. at 3:56-57 ("[R]eports are … output), 10:45-47 (describing "generating reports on media exposure and consumption"). A POSITA would understand that these reports comprise "output signaling user exposure to the identified reference media item." Mitzenmacher Decl., JA, Ex. 1 at ¶ 34; *see also* JA, Ex. 3, 10:45-47 (describing "generating reports *on media exposure and consumption*") (emphasis added). The specification further discloses that the reports are generated by hardware or software, illustrated with an example of an "analytical reporting server 119." JA, Ex. 3, 10:51-54 ("Reports [generated by analytical reporting server 119] can include, for example: advertisement play rates"). Thus, a POSITA would understand that the "output device … for generating output signaling user

exposure to the identified reference media item" is "hardware or software … for generating output signaling user exposure to the identified reference media item". Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 23, 32, 34.

> c.  Alternatively, should the Court find the "output device" term is in means plus function form under 35 U.S.C. § 112 ¶ 6, the term is not indefinite because the specification discloses sufficient corresponding structure.

Because ACRCloud cannot overcome the presumption that § 112, ¶ 6 does not apply, the Court should also hold that the "output device" limitation is not indefinite under § 112 ¶ 2.[7] *See Boston Sci.*, 2017 WL 1364205, at *7; *TriPlay*, 2016 WL 3574012, at *10. However, if the Court determines that the "output device" limitation is subject to means-plus-function treatment, the specification of the '823 patent discloses sufficient corresponding structure in the form of a server, such as the "analytical reporting server 119" described at 10:51-62, and FIG. 1.[8] *See Williamson*, 792 F.3d at 1352; *In re Aoyama*, 656 F.3d 1293, 1297 (Fed. Cir. 2011) (citing *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334 (Fed. Cir. 2004).

Structure disclosed in the specification is "corresponding structure" where "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210, (Fed. Cir. 2003) (citation omitted). Here, the specification's descriptions of "server 119" clearly link that structure to the function of "generating output signaling user exposure to the identified reference media item."  In particular, the "server 119" is described as a component that "generat[es] reports on media exposure and consumption." JA, Ex. 3, 10:45-47. Those reports, as

---

[7] ACRCloud has raised no indefiniteness arguments beyond incorrectly positing that the "output device" term is subject to 35 U.S.C. § 112, ¶ 6 and lacks corresponding structure.
[8] The parties agree that if the "output device" term is a means-plus-function term, the claimed function is "generating output signaling user exposure to the identified reference media item."

explained above, are the "output" of the system. The specification further explains that the server "generate[s] reports 120" which include information relating to user exposure to a media item, such as "advertisement play rates," "program ratings," "metrics of marketing effectiveness," or other information. *Id.* at 10:51-58. Thus, even if § 112, ¶ 6 were to apply to this claim limitation, ACRCloud cannot overcome its burden of proof to show that this term is indefinite by clear and convincing evidence, *see TecSec*, 731 F.3d at 1349, because the specification "clearly links" the structure of the server 119 to the function of "generating output signaling user exposure to the identified reference media item." *Aoyama*, 656 F.3d at 1297.

### 2.    Defendant's Answering Position

ACRCloud agrees with the function and structure proposed by Nielsen. As such, only one dispute remains as to this term: whether it should be construed as a means-plus-function term as ACRCloud proposes, or with a "plain and ordinary meaning" of essentially "hardware or software" for performing the function, as Nielsen proposes.

To determine whether §112 ¶ 6 applies to a claim limitation, the Court must first determine whether the disputed limitation uses the word "means." If it does, there is a rebuttable presumption that §112 ¶ 6 applies. *See Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1348-49 (2015) (en banc). If not, there is a rebuttable presumption that the provision does not apply, which "can be overcome and §112 para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1348. Importantly, "[t]he question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term is subject to section 112(f) if it recites function without reciting sufficient structure for performing that function." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020).

The Federal Circuit has said found that "device" is a nonce word, i.e., a word that "sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used." *Williamson,* 792 F.3d at 1350; *Robert Bosch, LLC v. Snap On Inc.*, 769 F.3d 1094, 1101 (Fed. Cir. 2014) ("[T]his court has found the word 'device' to be a non-structural, 'nonce' word."). This is consistent with its meaning in the art: A "device" is "any element … or component designed for a specific use for purpose." *See* JA, Ex. 18, Academic Press Dictionary of Science and Technology (1992), p. 622.; JA, Ex. 19, Anderson Decl. at ¶ 30. Nielsen does not argue that "device" connotes specific structure, only that it is any "hardware or software" that performs the claimed function. *See* Opening Br. at 18-19. Thus, the presumption against the application of §112 ¶ 6 is overcome here. *Williamson,* 792 F.3d at 1350.

Adding the modifier "output" states the functionality of the "device," but does not impart any structural significance to the term. *See* Anderson Decl. at ¶ 31; *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-CV-03657-SI, 2016 WL 6563343, at *8-*9 (N.D. Cal. Nov. 4, 2016) (construing "selecting device which selects one of a plurality of [predetermined] reference signals in accordance with information indicating a memory state to which said memory cell is to be programmed" as means-plus-function because "[t]he Court agrees with defendant that "selecting device" is a generic term [and] Plaintiff does not dispute that "device" is a nonce word devoid of specific structure"); *Script Sec. Sols. L.L.C. v. Amazon.com, Inc.*, No. 2:15-CV-1030-WCB, 2016 WL 3959804, at *4–5 (E.D. Tex. July 22, 2016) (parties agree that "information gathering device adapted to receive said predetermined signal, to gather information relating to said movement, and to transmit said information" limitation is a means-plus-function).

23

Nor can the recited claim function, "generating output signaling user exposure to the identified reference media item," inform the structure of "an output device," because the function is result-oriented. Anderson Decl. at ¶ 32.

Although Nielsen cites several papers and dictionaries in support of its argument that one ordinary skill in the art (POSITA) would understand "output device" to have sufficiently definite structure (Opening Br. at 18-19), "merely listing examples of possible structures is insufficient to avoid invocation of § 112, ¶ 6." *Robert Bosch*, 769 F.3d at 1101. On the contrary, the opinions of Nielsen's expert, Mr. Mitzenmacher, support means-plus-function treatment of this claim term. Mr. Mitzenmacher opines that the plain and ordinary meaning of "output device … for generating output" is "hardware or software for generating output." Mitzenmacher Decl. ¶ 23. Mr. Mitzenmacher goes on to opine that the scope of "output device" may include "displays, printers, hard-disks, and so on." *Id.* at ¶ 26. He first relies on a definition of the term that, consistent with ACRCloud's position, encompasses "[a]ny device" that "outputs" information. *Id.* at ¶¶ 28-31. The second definition he relies on restricts the term to "[e]lectronic or electromechanical equipment connected to a computer"—but that definition conflicts with his own statements that an "output device" can be "software." *Id.* at ¶¶ 23, 32. Further, while Mr. Mitzenmacher offers a broad list of what types of hardware or software could be encompassed by the term, he offers no suggestion of anything that would be *excluded* by that term. *Id.* at ¶¶ 23-34. It is a classic "nonce word." *Williamson,* 792 F.3d at 1350 ("Generic terms such as . . . 'device' . . . that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure'").

Because the scope of "output device" is so generically broad, this term necessarily fails to recite definite structure for performing the claimed function.

24

### 3. Plaintiff's Reply Position

ACRCloud previously argued that both disputed terms in the '823 patent ("output device" and "server selector") are (1) written in means-plus-function form, requiring interpretation under pre-AIA 35 U.S.C. § 112, ¶ 6, and (2) indefinite. D.I. 72, Claim Chart at 2. Now, ACRCloud has abandoned its indefiniteness position in view of Nielsen's Opening Claim Construction Brief. In addition, ACRCloud has indicated that it agrees with the structure Nielsen has identified in the specification corresponding to the disputed terms, if the Court finds pre-AIA 35 U.S.C. § 112, ¶ 6 applies to the terms. Accordingly, the only remaining issues for the Court to address are (1) whether the terms should be construed under pre-AIA 35 U.S.C. § 112, ¶ 6, and, if not, (2) whether the Court should adopt Nielsen's proposed construction (to which ACRCloud offers no alternative). The Court should hold that these terms are not subject to construction under pre-AIA 35 U.S.C. § 112, ¶ 6 and interpret them as having their ordinary meaning (which Nielsen sets forth below).

> a. The "output device" limitation is not a means-plus-function claim limitation

Because the "output device" term does not use the word "means," ACRCloud must overcome a presumption that the term is not subject to 35 U.S.C. § 112, ¶ 6. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). ACRCloud incorrectly asserts that it has successfully overcome the presumption because "[t]he Federal Circuit has found that 'device' is a nonce word," and "Nielsen does not argue that 'device' connotes specific structure." Ans. Br. at 23. ACRCloud's position is unsupported (and wrong) for three reasons. First, ACRCloud misstates the disputed term as "device," but the term is actually "output device." Second, ACRCloud fails to rebut Nielsen's evidence that "output device" connotes structure sufficient to

avoid treatment under pre-AIA 35 U.S.C. § 112, ¶ 6. And third, ACRCloud ignores caselaw that does ***not*** find "output device" to be a means-plus-function term.

First, ACRCloud's arguments improperly address a strawman in the form of the term "device," while the disputed term is "output device." *See Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (*citing TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)) (holding that the critical question is whether "***the claim term*** is used in common parlance or by persons of skill in the pertinent art to designate structure") (emphasis added); *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1359 (Fed. Cir. 2011) (holding that it was improper to construe the term "device" alone when the actual disputed term was "modernizing device," which connoted sufficiently definite structure to avoid means-plus-function treatment). ACRCloud's cited cases consider only whether the term "device" (and ***not*** whether the actual claim term "output device") is a nonce word. Moreover, ACRCloud ignores cases that find terms ***including*** the word "device" (along with other words) ***not*** to be in means form. *See e.g.*, *Inventio*, 649 F.3d at 1359 ("modernizing device").

Second, ACRCloud fails to rebut Nielsen's evidence that "output device" connotes structure sufficient to avoid treatment under pre-AIA 35 U.S.C. § 112, ¶ 6. More specifically, "output device" connotes a ***class*** of structures sufficient to avoid interpretation under 35 U.S.C. § 112, ¶ 6. *Skky, Inc.* 859 F.3d at 1019 ("it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function").

The dictionary definitions and expert testimony cited by Nielsen in its Opening Brief confirm that a POSITA would have understood the class of structures that "output device" connotes. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 24-26; JA, Ex. 4, Kopper 2005 at 5; JA, Ex. 5,

26

Buchanan 1998 at 10. These citations are not merely "examples of possible structures" capable of performing the claimed function, as ACRCloud argues. Ans. Br. at 24 (quoting *Robert Bosch, LLC v. Snap On Inc.,* 769 F.3d 1094, 1101 (Fed. Cir. 2014). ACRCloud offers no competent evidence to rebut Nielsen's argument.[9] Thus, ACRCloud has not overcome the presumption against means-plus-function treatment. *See Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007–08 (Fed. Cir. 2018) ("Apple argued that the limitations must be construed under § 112, ¶ 6, but provided no evidentiary support for that position. Accordingly, Apple failed to carry its burden, and the presumption against the application of § 112, ¶ 6 to the disputed limitations remained unrebutted.").

Third and finally, ACRCloud ignores caselaw that does ***not*** hold that "output device" is a means-plus-function term. For example, this Court previously construed the phrase "an output device connected to said microprocessor…" as "one or more output devices connected to said microprocessor" without subjecting the claim to interpretation under means-plus-function rules. *See Osseo Imaging, LLC v. Planmeca USA, Inc.*, C.A. No. 17-1386-JFB, 2018 WL 5617544 (D. Del. Oct. 30, 2018); *see also, e.g., Pacing Techs., LLC v. Garmin Int'l, Inc.*, 977 F. Supp. 2d 1013, 1026 (S.D. Cal. 2013), *aff'd*, 778 F.3d 1021 (Fed. Cir. 2015) (holding the term "output device" should have its plain and ordinary meaning and did not require construction). One court even held, when construing a generic "means" term under 35 U.S.C. § 112, ¶ 6, that the "output devices" in the specification constituted corresponding structure, further demonstrating that this term recites structure. *See International Gamco, Inc. v. Multimedia Games, Inc.*, No. 04-1053,

---

[9] The *ipse dixit* of ACRCloud's expert is insufficient as a matter of law without further supporting evidence. *See Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.*, No. 2:19-CV-00514-JDW, 2020 WL 6158233, at *11 (E.D. Pa. Oct. 21, 2020) (*quoting TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019) ("an expert cannot offer an opinion on claim construction based solely on his experience, '[u]ntethered to any supporting evidence.'")

2009 WL 10664875 (S.D. Cal. Apr. 20, 2009) (holding corresponding structure for term "means ... for communicating to the player the receipt of a winning or losing play and the amount won" is "output devices").

Accordingly, ACRCloud has failed to overcome the presumption that "output device" is not in means-plus-function form.

        b.    The "output device" limitation should be construed in accordance with its plain and ordinary meaning

ACRCloud offers no construction for "output device" if it is held not to invoke § 112, ¶ 6. ACRCloud accordingly cannot disagree with Nielsen that the plain and ordinary meaning applies if the term is not given means-plus-function treatment. If the Court finds it necessary to make a finding as to the plain and ordinary meaning, it should adopt Nielsen's proposal, which is "hardware or software for generating output signaling user exposure to the identified reference media item." This proposal is well-supported by dictionary definitions, expert testimony, and the specification of the '823 patent. *See*, Op. Br. at 19-20; *e.g.*, JA, Ex. 6, A DICTIONARY OF COMPUTING (6th ed. 2008) (defining "output device" as "[a]ny device that converts the electrical signals representing information within a computer into a form that can exist or be sensed outside the computer")); JA, Ex. 7, https://techterms.com/definition/outputdevice (defining "output device" as "[a]ny device that outputs information from a computer"); JA, Ex. 8 https://www.computer-dictionary-online.org/definitions-o/output-device.html (defining "output device" as "[e]lectronic or electromechanical equipment connected to a computer and used to transfer data out of the computer"); Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 23, 27-33; JA, Ex. 3, '823 patent, FIGS. 1, 2, 4; *see also id.* at 3:56-57, 10:45-47.

ACRCloud criticizes one of Dr. Mitzenmacher's three dictionary definitions ("[e]lectronic or electromechanical equipment connected to a computer and used to transfer data

out of the computer"). According to ACRCloud, this definition conflicts with his opinion that an "output device can be software." Ans. Br. at 24. But to the contrary, there is no conflict, as "electronic or electromechanical equipment that transfers data out of a computer" ***necessarily includes software for generating output*** using that equipment. Indeed, the "analytical reporting server 119" that ACRCloud agrees corresponds to "output device" would utilize software to generate output.

ACRCloud's criticism of Dr. Mitzenmacher's opinion because he "offers no suggestion of anything that would be *excluded* by" Nielsen's proposed construction is unwarranted. *See* Ans. Br. at 24. Nielsen and Dr. Mitzenmacher have identified a class of structures identified by the "output device": "hardware or software for generating output signaling user exposure to the identified reference media item," which includes "structures such as a server, a computer monitor, a printer, or a hard disk, among other possibilities." Mitzenmacher Decl., JA, Ex. 1, ¶24. Anything outside of that class of structures is excluded from this claim term, including (but by no means limited to) numerous physical computer elements that provide ***input*** to a computer, such as a computer mouse, keyboards, cameras, microphones, scanners, and joysticks. By its terms, it would also exclude any software programs that facilitate input to a computer or provide anything else that is not output.

### 4.    Defendant's Sur-Reply Position

Nielsen's construction of "output device" supports ACRCloud's position that it is a nonce word subject to means-plus-function treatment. Nielsen's argument that "output device" is not a nonce word because "numerous physical computer elements that provide ***input*** to a computer, such as a computer mouse, keyboards, cameras, microphones, scanners, and joysticks" are not without the scope of the claimed "***output*** device," highlights the essentially boundless scope of Nielsen's proposed construction. *See* Reply Br. at 29. Limiting "output device" to "exclude any

software programs that facilitate input to a computer or provide anything else that is not output" as Nielsen proposes merely construes "output device" as any device that outputs anything. *Id.*

Nielsen argues that the Court should ignore the cases holding that "device" is a nonce word, and instead focus on "output device." But Nielsen's claims that "output device" connotes a specific structure or class of structures to a person of skill in the art are belied by its own proposed definition of "output device," which amounts to nothing more than "hardware or software"—i.e., any means or structure capable of performing the function. *See Williamson*, 792 F.3d at 1350 (a nonce word "sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used."). If "output device" connoted a specific structure, Nielsen could have construed it that way.[10]

Nielsen's citations to *Osseo* and *Pacing* are meaningless, as neither case addresses whether "output device" is a nonce word or should otherwise be interpreted under § 112 ¶ 6. *See Osseo*, 2018 U.S. Dist. LEXIS 185835 at *19; *Pacing*, 977 F. Supp. 2d at 1026.

As such, Nielsen fails to rebut ACRCloud's arguments for means-plus-treatment of this term, and ACRCloud's proposed construction should be adopted.

C. **"a stream collection server selector, for selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media item" (Claim 6 of the '823 patent)**

| Term | Nielsen Proposal | ACRCloud Revised Proposal |
|---|---|---|
| "a stream collection server selector, for selecting, based on at least one of | Plain and ordinary meaning, i.e., a software program, or the computer on which that program runs, for selecting one of the plurality of data signature stream collection servers to | Means-plus-function<br>• Function: "selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature |

---

[10] Nielsen protests that its "plain and ordinary meaning" construction of "output device" would exclude "input" devices. Reply Br. at 29. But that is not a specific *structure*. It is merely a statement of the device's function.

30

| Term | Nielsen Proposal | ACRCloud Revised Proposal |
|------|------------------|----------------------------|
| load[11] and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media item" (claim 6) | receive the representation of at least one target media item, the selecting based on prior requests sent to the plurality of data signature stream collection servers and/or geographic proximity to the client device; this is not a means-plus-function element. Alternatively, if the Court decides that the element is in means-plus-function form: <br> • The function is "selecting one of the plurality of data signature stream collection servers to receive the representation of at least one target media item, the selecting based on prior requests sent to the plurality of data signature stream collection servers and/or geographic proximity to the client device" <br> • The corresponding structure is "correlator server 115" as described at 9:11-53, and FIG. 3 | stream collection servers to receive the representation of at least one target media item" <br> • The corresponding structure is "correlator server 115" as described at 9:11-53, and FIG 3. |

### 1.    Plaintiff's Opening Position

ACRCloud contends that "a stream collection server selector, for selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media item" (the "server selector" limitation) is subject to 35 U.S.C. § 112, ¶ 6. Because this limitation does not use the term "means," ACRCloud bears the burden of overcoming the presumption that it is

---

[11] The term "load" appears within the disputed "stream collection server selector" limitation. Nielsen has therefore incorporated the meaning of "load" into its proposed construction. ACRCloud, by contrast, seeks to construe "load" in isolation.

*not* in means-plus-function form. *Williamson*, 792 F.3d at 1348. But ACRCloud cannot overcome the presumption because the term "server selector" is itself a "recital of structure" for performing the claimed function. This limitation should instead be construed in accordance with its plain and ordinary meaning: "a software program, or the computer on which that program runs, for selecting one of the plurality of data signature stream collection servers to receive the representation of at least one target media item, the selecting based on prior requests sent to the plurality of data signature stream collection servers and/or geographic proximity to the client device."

Although ACRCloud further contends that this limitation is indefinite, as explained above, a court's finding that § 112, ¶ 6 does not apply strongly indicates that the limitation is sufficiently definite. *See Boston Sci.*, 2017 WL 1364205, at *7; *TriPlay*, 2016 WL 3574012, at *10. And even if § 112, ¶ 6 were to apply, the specification recites sufficient corresponding structure such that the term is not indefinite.

a.     The "stream collection server selector" term is not a means-plus-function limitation.

Because the server selector limitation does not use the word "means," there is a presumption against the application of § 112 ¶ 6. *Williamson*, 792 F.3d at 1348. ACRCloud cannot overcome this presumption because it cannot show that this term "fails to recite sufficiently definite structure." *Id.* (internal quotation marks omitted and citation omitted).

The term "server selector" would be understood by a POSITA to be a sufficiently definite recitation of structure. *Williamson*, 792 F.3d at 1349. A "server selector" is another name for a load balancer, which is a component—well-known to a POSITA—that balances loads by distributing network traffic across multiple servers. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 35, 37-40. *See, e.g.*, JA, Ex. 9, He 2000 at 1170 (describing a "***Load Balancing Server Selector*** (the

LBS Selector)"); JA, Ex. 10, He & Yang 2000 at 5-6 (describing "a web server selector" as a component that "is in charge of accepting HTTP requests and scheduling one of the servers to respond to requests" (i.e., a load balancer)); JA, Ex. 11, Sandholm 1998 at 16 (illustrating a load balancing scenario using a "Server Selector"); JA, Ex. 12, Cardellini 1999 at 104 (using a "server selector" to "assign[] each address request to one of the Web server based on some dispatching algorithm" (*i.e.*, load balancing)).

A POSITA would also have been aware that server selectors/load balancers were implemented using software running on servers or specialized hardware. Mitzenmacher Decl., JA, Ex. 1 at ¶ 41; JA, Ex. 15, Bourke 2001 at 30 ("Server-based load balancers are usually PC-based units running a standard operating system… [s]witch-based load balancers, also known as hardware-based load balancers, are devices that rely on Application Specific Integrated Circuit (ASIC) chips to perform the packet-rewriting functions"); JA, Ex. 11, Sandholm 1998 at 15-18; *see also* JA, Ex. 10, He & Yang 2000 at 5-6, 16 (implementing "a web server selector (WS selector)" as a "proxy server"); JA, Ex. 16, *Server Definition*, LINUX INFORMATION PROJECT (May 16, 2005), https://www.linfo.org/server.html ("A server is [a] software program, or the computer on which that program runs, that provides a specific kind of service to client software running on the same computer or other computers on a network."). Accordingly, POSITA would have readily recognized that the term "server selector" connotes definite structure such that § 112, ¶ 6 is inapplicable. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 41-42; *see Dyfan*, 28 F.4th at 1366. Given this evidence, ACRCloud cannot overcome its burden to show that this term is in means form.

> b.    The "stream collection server selector" limitation should be construed as "a software program, or the computer on which that program runs, for selecting one of the plurality of data signature stream collection servers to receive the representation of at least

one target media item, the selecting based on prior requests sent to the plurality of data signature stream collection servers and/or geographic proximity to the client device"

(1)    Nielsen's construction is the plain and ordinary meaning of the "stream collection server selector" term.

The specification of the '823 patent does not assign any special definition to the "server selector" limitation, so the Court should "construe [this term] according to [its] ordinary meaning" in the context of the specification. *Symantec*, 522 F.3d at 1291; *see also Hill-Rom*, 755 F.3d at 1371. ACRCloud offers no construction for this limitation.

Nielsen's proposed construction is consistent with the ordinary meaning (as evidenced by various references) of server selectors/load balancers[12], which a POSITA understands can be implemented as software or hardware. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 41-42, 44; JA, Ex. 15, Bourke 2001 at 30; JA, Ex. 11, Sandholm 1998 at 15-18. Thus, a POSITA would understand that the plain and ordinary meaning of "stream collection server selector" is "a software program, or the computer on which that program runs" for performing the claimed function of "selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media item". Mitzenmacher Decl., JA, Ex. 1 at ¶ 44.

In addition, Nielsen's proposed construction is consistent with "the context of the specification and prosecution history." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (citing *Phillips*, 415 F.3d at 1313). Specifically, in one embodiment, the specification of the '823 patent describes the use of a server ("correlator server 115") to send requests to one of a plurality of servers (or "nodes") "based on load and other factors." *See, e.g.*, JA, Ex. 3, 9:51-53. The patent's description of a server selector/load balancer that takes the form

---

[12] As explained above, a "server selector" is the same as a "load balancer." *See* § IV.C.1.a, *supra*.

of a server (which is software or the computer on which it runs) is consistent with the plain and ordinary meaning of the term. Mitzenmacher Decl., JA, Ex. 1 at ¶ 45.

> (2)    Nielsen's proposed construction properly incorporates the meaning of "load".

The term "load" appears within the "stream collection server selector" limitation. Therefore, the Court should not construe "load" in isolation, as ACRCloud proposes, but instead as part of the "stream collection server selector" limitation. *See TQ Delta, LLC v. Adtran, Inc.*, C.A. No. 14-954-RGA, 2018 WL 2002481, at *5 (D. Del. Apr. 27, 2018) ("[T]he first use of this term within a larger phrase in the claims provides adequate context for the subsequent uses of this term. Therefore, this term does not require separate construction.").

Nielsen's proposed construction incorporates the meaning of the term "load" in the context of the "server selector" limitation. In particular, Nielsen's construction defines "load" as "prior requests sent to the plurality of data signature stream collection servers." A POSITA would understand that the server selector/load balancer determines which server will be used based on "prior requests sent to the plurality of data signature stream selection servers" (*i.e.,* based on load). Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 36, 52. This is consistent with the specification, which affirms that load is determined by requests sent to a server. *See, e.g.*, JA, Ex. 3, 4:39-44 (describing an embodiment in which "reduc[ing] the quantity of data to be transmitted" to a server correspondingly reduces "bandwidth requirements and system load."); 9:46-53 (explaining that correlator server 115 distributes samples from MCDs amongst nodes 303 operating in parallel to avoid "becom[ing] overloaded.").

As explained above, a POSITA would understand that a server selector is a load balancer. Mitzenmacher Decl., JA, Ex. 1 at ¶¶ 35, 37-40. *See, e.g.*, JA, Ex. 9, He 2000 at 1170; JA, Ex. 10, He & Yang 2000 at 5-6; JA, Ex. 11, Sandholm 1998 at 15-18; JA, Ex. 12, Cardellini 1999 at 104.

A server selector/load balancer works by distributing requests to other servers based on prior requests to balance the load amongst them. Mitzenmacher Decl., JA, Ex. 1 at ¶ 36. A variety of well-known strategies can be used to distribute requests. These strategies are typically referred to as "static" or "dynamic" depending on whether they take into account the current load of each computing unit in addition to prior requests. *See id.*, JA, Ex. 1 at ¶¶ 48-49; JA, Ex. 13, Zhang 1997 at 100 ("Policies that use only information about the average behaviour of the system, ignoring the current state, are termed static policies . . . Policies that react to the system state are termed dynamic policies"); JA, Ex. 14, https://en.wikipedia.org/wiki/Load_balancing_(computing).

One example of a static strategy is referred to as "round-robin," which sequentially assigns incoming requests to each server until all servers have been assigned one request, after which the process repeats. JA, Ex. 11, Sandholm 1998 at 18 ("the servers are invoked starting with one server and then invoking all other servers in turn before invoking the first one again"); Mitzenmacher Decl., JA, Ex. 1 at ¶ 50. An example of a dynamic algorithm is one that takes into account "response time" with the goal of "minimiz[ing] the maximum response time of any server." JA, Ex. 17, Westbrook 1995, Abstract; Mitzenmacher Decl., JA, Ex. 1 at ¶ 51. In both cases, the server selector/load balancer assigns requests based on prior requests sent to the other servers. Mitzenmacher Decl., JA, Ex. 1 at ¶ 52.

ACRCloud's proposed construction of "load" should be rejected because it unduly narrows the '823 patent and has no grounding in the claims or specification, which never refer to "work performed" or "resources used" by the server, nor do the claims and specification describe load "as a percentage of total capacity." Moreover, a construction including "work performed" or "resources used," or specifically requiring measurement of load as a "percentage of capacity"

36

would exclude static load balancing methods (such as round-robin methods), as discussed above, with no rationale in the claim or specification to do so. Mitzenmacher Decl., JA, Ex. 1 at ¶ 53. The Court should reject ACRCloud's narrowing of the claim.

The plain and ordinary meaning of "selecting, based on … load" is therefore "selecting … the selecting based on prior requests sent to the plurality of data signature stream collection servers," as reflected in Nielsen's proposed construction.

        c.     Alternatively, should the Court find the "stream collection server selector" term is in means plus function form under 35 U.S.C. § 112 ¶ 6, the claim is not indefinite because the specification discloses sufficient corresponding structure.

Because ACRCloud cannot overcome the presumption that § 112, ¶ 6 does not apply, the Court should also hold that the "server selector" term is not indefinite under § 112 ¶ 2. *See Boston Sci.* 2017 WL 1364205, at \*7; *TriPlay*, 2016 WL 3574012, at \*10. To the extent the Court finds that the "stream collection server selector" is a means-plus-function limitation, the specification discloses sufficient structure corresponding to the claimed function in the form of a server, such as the "server 115" described at JA, Ex. 3, 9:11-53 and FIG. 3.

More specifically, the specification describes embodiments in which the stream collection server selector is a "correlator server 115." *See* JA, Ex. 3, 9:11-21, 9:39-53, 10:4-10 & FIGS. 1, 3. The specification discloses that this server "dispatches MCDs [mobile client devices] to available nodes 303 based on load or other factors." *Id.* at 9:51-53. In this embodiment, the correlator server is the server selector, and the available nodes are data signature stream collector servers. The description thus maps directly onto the claim language, which requires the server selector to select ("dispatch") a data signature stream collection server ("available nodes") based on load or geographic proximity ("load or other factors."). *Id.* The description of the correlator server as the server selector is confirmed by the patent's disclosure of another embodiment, in

which "correlator server(s) 115 sends samples from stream store 114 to an appropriate node 303 *based on load and other factors*." *Id.* at 10:4-6 (emphasis added).

Thus, even if § 112, ¶ 6 were to apply to the "server selector" limitation, it is not indefinite because the specification "clearly links" the structure of a server to the function of "selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media item." *Aoyama*, 656 F.3d at 1297. Accordingly, ACRCloud cannot show that this term is indefinite by clear and convincing evidence. *See TecSec*, 731 F.3d at 1349.

### 2.    Defendant's Answering Position

ACRCloud agrees with the structure proposed by Nielsen for this term. ACRCloud also agrees with the function proposed by Nielsen, except as to the term "load." As such, three disputes remain as to this claim language:

1.    Whether the term should be construed as a means-plus-function claim element, as ACRCloud proposes, or as its alleged "plain and ordinary meaning" of essentially "a software program, or the computer on which that program runs," as Nielsen proposes.

2.    Whether "load" should be construed separately, as ACRCloud proposes, or as part of this term, as Nielsen proposes.

3.    Whether "load" should mean the load at a point in time, as ACRCloud proposes, or should be restricted to "prior requests," as Nielsen proposes.

ACRCloud addresses disputes (2) and (3) in the section directed to "load," below, as set forth in the Joint Claim Chart (D.I. 72 at 4).

A claim term fails to recite sufficiently definite structure if the claim merely recites a generic nonce word and the remaining claim language, specification, prosecution history, and relevant external evidence provide no further structural description to a POSITA. *See Mass. Inst.*

38

*Of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006). The Federal Circuit, for example, has referred to terms such as "mechanism," "member," "element," and "device" as terms that can invoke § 112, ¶ 6. *Id.* ("colorant selection mechanism" was a means-plus-function term); *see also Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214-16 (Fed. Cir. 1998) (presumption against § 112, ¶ 6 rebutted where claim recited "element" and "member" and patent provided no further structural description of these generic terms).

The '823 patent specification does not shed light on the meaning of "a stream collection server selector" or "server selector" as those phrases are entirely absent from the specification. Nor can the recited claim function, "selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers to receive the representation of at least one target media item," inform the structure of "stream collection server," because the functions are result-oriented. *See* Anderson Decl. at ¶ 36. A "selector" is a generic term that generally means any element or component that selects. *See* Anderson Decl. at ¶ 35; JA, Ex. 21, Academic Press Dictionary of Science and Technology (1992), p. 1949 ("The selector can be considered to be a generic procedure name"). "Selector" has been construed to be a means-plus-function term. *See SPH America, LLC v. AT&T Mobility, LLC*, 2015 WL 12831674, at *5 (S.D. Cal. June 9, 2015) ("**selector** is governed by 35 U.S.C. § 112(f)"). Adding modifier "stream collection server" does not impart any structural significance to the term because it merely limits the target of the selection function. *See* Anderson Decl. at ¶ 36; *MLC Intell. Prop*, 2016 WL 6563343, at *8-*9.

Nielsen argues that, outside of the context of the '823 patent, the term "server selector" was synonymous with "load balancer." *See* Opening Br. at 34-35. But whether a "server selector" may be understood to be a "load balancer" (or anything else) is irrelevant to this claim term and

the '823 patent generally. The claim term at issue is "stream collection server selector," not a generic "server selector." The '823 patent's specification does not discuss any "server selector." Nielsen's attempt to conflate a portion of "stream collection server selector" with a "load balancer" has no basis in the language of the claim or the '823 specification. *See* Anderson Decl. at ¶ 37. Therefore, it is no surprise that Nielsen's "load balancer" arguments rely exclusively on extrinsic evidence. *See* Opening Br. at 32-33; Mitzenmacher Decl. ¶¶ 35-41. To rely exclusively on extrinsic evidence to construe this term as Nielsen proposes would be legal error. *See Weber, Inc. v. Provisur Techs., Inc.*, 92 F.4th 1059, 1070 (Fed. Cir.) ("We need not consider the extrinsic evidence that limits the claim scope in a manner not contemplated by the intrinsic record."), *cert. denied sub nom. Provisur Techs., Inc. v. Weber, Inc*, 145 S. Ct. 173 (2024); *Vivint, Inc. v. ADT LLC*, No. 2023-1995, 2024 WL 5074569, at *2 (Fed. Cir. Dec. 11, 2024) ("Extrinsic evidence alone … cannot serve to limit a claim's scope.").

Even if "server selector" standing alone were relevant to the dispute there, a POSITA would not understand the "server selector" to be synonymous with a "load balancer." *See* Anderson Decl. at ¶ 37. The '823 patent specification does not mention the term "load balancer." The complete lack of use of the term "load balancer" in the '823 patent is unsurprising, because "server selector" is broader than a "load balancer" and can encompass, as set forth in the claim language itself, selection of a server on a criterion other than "load." Unlike a "load balancer," the "server selector" described in the claim and specification can select a server based on "geographic proximity/location" and/or "other factors"—not just "load." *See* '823 patent at 6:3-8 ("a plurality of servers **107** are used, and transmissions of data from MCDs **101** are directed to an appropriate server **107** for receipt, based on current load, geographic location, and/or other factors."). Read in context, the "server selector" is nothing more than another classic nonce word,

40

which encompasses anything that performs the claimed function of "selecting . . . one of the . . . servers." *Williamson,* 792 F.3d at 1350.

Nielsen cites several papers and dictionaries trying to support its argument, but "merely listing examples of possible structures is insufficient to avoid invocation of § 112, ¶ 6." *Robert Bosch*, 769 F.3d at 1101. Moreover, none of Nielsen's references state that a "server selector" is a "load balancer" or that the terms are synonymous: (1) He 2000 uses "server selector" only to mean a server that selects a load balancing server or "LB Server" (JA, Ex. 9 at 1170); (2) He & Yang 2000 refers to a "web server selector" (not a load balancer) that selects a web server by either distributing a "predefined percentage" of requests to each server *or* based on "workload." (JA, Ex. 10 at 16); (3) Sandholm 1998 describes a "server selector" that selects servers based on current load, but does not state that *all* "server selectors" *must* select servers based on load, or that the terms are synonymous (JA, Ex. 11 at 16); and (4) Cardellini 1999 describes a broader dispatch system and uses "server selector" as a word to describe the component of that system that does the selecting (JA, Ex. 12 at 104).

### 3. Plaintiff's Reply Position

a. "Server Selector" is not in means-plus-function form

In its opening brief, Nielsen cites multiple technical references showing that "server selector" identifies sufficiently definite structure to one of skill in the art to avoid means-plus-function treatment. ACRCloud's primary argument that the "server selector" term is a means-plus-function term consists of its assertion that "selector" is a "nonce" word. But ACRCloud never cites any case in which a court has found "selector" (or "server selector") to be a nonce word.[13] And more importantly, even if ACRCloud could establish that "server selector" is a

---

[13] Even the cases ACRCloud does cite (which are not on-point) pre-date *Williamson*, which establishes the current legal regime for the issues addressed in this portion of the brief. *See Mass.*

nonce term (which it cannot), that would not be enough to show the term should be given means-plus-function treatment. To the contrary, ACRCloud would still have the additional burden to demonstrate that this term does not "recite sufficiently definite structure." *Williamson*, 792 F. 3d at 1349; *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299-1300 (Fed. Cir. 2014), overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("Even if a patentee elects to use a 'generic' claim term, such as 'a nonce word or a verbal construct,' properly construing that term (in view of the specification, prosecution history, etc.) may still provide sufficient structure such that the presumption against means-plus-function claiming remains intact."). ACRCloud has made no attempt to satisfy that burden. *See Zeroclick*, 891 F.3d at 1007–08.

ACRCloud also argues that the absence of the exact phrase "server selector" in the specification somehow shows that the "specification does not shed light on [its] meaning" and that therefore, it is a means-plus-function term. Ans. Br. at 39. ACRCloud's argument on this point is refuted by its own admission that the specification discloses structure (in the form of "correlator server 115") that corresponds to the "server selector" term. Ans. Br. at 29-30. Moreover, although the specification does not use the phrase "server selector," it does describe selecting a server in its discussion of the correlator server 115: "[E]ach node 303 processes a maximum of approximately 50 MCDs so as not to become overloaded. Correlator server 115 dispatches MCD files to available nodes 303 based on load and other factors." '823 patent, 9:49-53; *see also* 10:4-6 ("[C]orrelator server(s) 115 sends samples from stream store 114 to an appropriate node 303 based on load and other factors."). Because exact claim terms are not

---

*Inst. Of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214-16 (Fed. Cir. 1998).

required to appear in the specification, it is irrelevant that the phrase "server selector" does not appear in the specification of the '823 patent. *See, e.g.*, *TwinStrand Biosciences, Inc. v. Guardant Health, Inc.*, C.A. No. 21-1126-GBW-SRF, 2022 WL 17986012, at *9 (D. Del. Dec. 29, 2022) (holding that the meaning of terms not used in the specification "would be apparent to a person of ordinary skill in the art based on the context provided by the claim language."); *Sepracor Inc. v. Dey, L.P.*, 590 F. Supp. 2d 649, 657 (D. Del. 2008) (construing term not used in the specification).

In supposed support for its argument that "server selector" does not connote sufficient structure to avoid means-plus-function treatment, ACRCloud cites an inapposite dictionary definition using the term "selector" ***in a different technology area***. Ans. Br. at 39, citing Academic Press Dictionary of Science and Technology (1992), p. 1949. In particular, the cited definition applies solely to "object-oriented programming," which does not relate to the claims of the '823 patent.

In a further attempt to further bolster its argument, ACRCloud cites *SPH America, LLC v. AT&T Mobility, LLC*, No. 13-cv-2318-CAB-KSC, 2015 WL 12831674, at *5 (S.D. Cal. June 9, 2015) ("selector is governed by 35 U.S.C. § 112(f)"). Ans. Br. at 39. But unlike this case, the expert in *SPH* "provide[d] no evidence to support his conclusion that a selector connotes a class of structures, nor [did] he disclose any other structure that was commonly known or referred to as a selector." *Id.* at *4. In contrast, Nielsen and its expert provided substantial evidence that "selector" identifies sufficiently definite structure. *See* Op. Br. at 32-33; JA, Ex. 1, Mitzenmacher Decl. ¶¶ 35, 37-41, 43-44. In fact, other courts have found that a "selector" ***does*** recite sufficiently definite structure (when, as here, litigants offer evidence). *See S3 Inc. v. Nvidia Corporation*, 259 F.3d 1364, 1371 (Fed. Cir. 2001).

43

ACRCloud's criticism of Nielsen's assertion that a "server selector" is a "load balancer" (which is a component connoting definite structure to a POSITA) is unfounded. Ans. Br. at 39. Indeed, both the specification and the asserted claim expressly recite that a server is selected to balance "load." *See* '823 patent, claim 8 ("[A] stream collection server selector, for selecting, based on at least one of load and geographic proximity to the client device, one of the plurality of data signature stream collection servers…"); 9:49-53 ("[E]ach node 303 processes a maximum of approximately 50 MCDs so as not to become overloaded. Correlator server 115 dispatches MCD files to available nodes 303 based on load and other factors."). The extrinsic evidence also shows that. JA, Ex. 11, pp. 15 ("Server selection refers to selecting the target server from a group of identical servers in order to balance the load.").

ACRCloud argues that a "server selector" is not a "load balancer" because the claim language recites that "selecting" is based on ***either*** "load" ***or*** "geographic proximity to the client device." *See* Ans. Br. at 40. But this argument has no merit, as the term "load balancer" includes selection based on geography (and not just the size of the data load). *See e.g.*, JA, Ex. 22, Bourke, at 9-10 ("Global Server Load Balancing (GSLB) … distributes load to various locations as opposed to one location."); JA, Ex. 9, He at 1171 ("After receiving a DNS request, the LBS Selector [Load Balancing Server Selector] will select an LB Server for the user. The selection criteria can be based either on geographical locations of the LB Servers relative to the user or on other dynamic factors such as the current server load and network traffic situation."); JA, Ex. 14, https://en.wikipedia.org/wiki/Load_balancing_(computing) ("Numerous scheduling algorithms, also called load-balancing methods, are used by load balancers to determine which back-end server to send a request to. … More sophisticated load balancers may take additional factors into

account, such as a server's … geographic location"). Accordingly, Nielsen correctly characterizes the server selector as a "load balancer."

Finally, ACRCloud argues, incorrectly, that "[t]o rely exclusively on extrinsic evidence to construe ["server selector"] as Nielsen proposes would be legal error." *See* Ans. Br. at 40. But to the contrary, extrinsic evidence is commonly used to determine whether a term recites sufficiently definite structure under *Williamson*. *See Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) ("[W]e often look to extrinsic evidence when determining whether a disputed limitation would have connoted structure to a person of ordinary skill.") (citations omitted). ACRCloud's assertion to the contrary relies on inapposite cases in which the extrinsic evidence contradicts the intrinsic evidence. Ans. Br. at 40; *see e.g., Weber, Inc. v. Provisur Tech., Inc.,* 92 F.4th 1059, 1070 (Fed. Cir. 2024); *Vivint, Inc. v. ADT LLC*, No. 2023-1995, 2024 WL 5074569, at *2 (Fed. Cir. Dec. 11, 2024).

          **b.**    **ACRCloud proposes no construction for the "server selector" term, and thus, the Court should adopt Nielsen's characterization of the plain and ordinary meaning**

ACRCloud offers no construction for the "server selector" term if it is held not to invoke § 112, ¶ 6. ACRCloud accordingly cannot disagree with Nielsen that the plain and ordinary meaning applies if the term is not given means-plus-function treatment. If the Court finds it necessary to make a finding as to the plain and ordinary meaning, it should adopt Nielsen's proposal, which is "a software program, or the computer on which that program runs, for selecting one of the plurality of data signature stream collection servers to receive the representation of at least one target media item, the selecting based on prior requests sent to the plurality of data signature stream collections servers and/or geographic proximity to the client device." As explained in Nielsen's opening brief, this proposal is well-supported. *See*, Op. Br. at 33-35.

####    4.    Defendant's Sur-Reply Position

Nielsen acknowledges that "server selector" as a standalone term does not appear in the specification of the '823 patent (Reply Br. at 42), and that the corresponding structure in the specification for performing the claimed function, "***selecting***, based on at least one of load and geographic proximity to the client device, ***one of the plurality of*** data signature stream collection ***servers*** to receive the representation of at least one target media item," is "correlator server 115" as described at 9:11-53 and Fig. 1:



('823 patent at Fig. 1 (Correlator server(s) 115 highlighted).)  Nielsen also acknowledges that the relevant disclosure in the '823 patent specification "does describe selecting a server in its discussion of the correlator server 115: '[E]ach node 303 processes a maximum of approximately 50 MCDs so as not to become overloaded. Correlator server 115 dispatches MCD files to available nodes 303 based on load and other factors.'" (Reply Br. at 42 (citing '823 patent at 9:49-53).)

Therefore, as acknowledged by Nielsen, (i) the term "server selector" is not a standalone term in the '823 patent specification; (ii) the corresponding structure/disclosure for the "stream collection server selector" is "correlator server 115" as illustrated in Fig. 3; and (iii) the specification merely describes how the "correlator server 115" "select[s] a server." Nielsen's strained attempts to incorporate a "load balancer" based on nothing more than a "black box"

illustration of a "correlator server 115" and a specification that merely describes the server selection process demonstrates why Nielsen's proposed construction must be rejected. This is a classic example of impermissibly construing a claim term based on extrinsic evidence without support in the specification.

Nielsen argues that ACRCloud must meet an "additional burden" beyond showing that "selector" is a nonce word. Reply Br. at 42. But, as set forth above, ACRCloud's burden is only to "demonstrate[] that the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1348; *see Apple*, 757 F.3d at 1300 ("[I]f the claim merely recites a generic nonce word and the remaining claim language, specification, prosecution history, and relevant external evidence provide no further structural description to a person of ordinary skill in the art, then the presumption against means-plus-function claiming is rebutted."). Nielsen's argument that the specification discloses structure for a "server selector" is irrelevant, because Nielsen does not rely on that structure in its proposed construction. Instead, it acknowledges that the specification itself does not use the term, and proposes only to construe "server selector" as software or the computer it runs on.[14]

Nielsen cites *S3* as holding that "selector" is a sufficiently definite structure (Reply Br. at 43), but that case involved a "selector" disclosed in the specification as support for a means-plus-function claim element. 259 F.3d at 1370. And it held that a "selector" is an "element" of an "integrated circuit," a "standard electronic component" such as a "multiplexer." *Id.* That definition

---

[14] Nielsen claims ACRCloud's cited definition is from a "different technology area," object-oriented programming. Reply Br. at 43. But it offers no expert testimony that the invention somehow precludes the use of object-oriented programming or that a person of skill in the art reading the patent would be unfamiliar with it.

conflicts with Nielsen's own definition of *any* software or the computer that runs it. In any event, it is irrelevant that a court found "selector" to have some other meaning in the context of integrated circuits.

In its reply, Nielsen attempts to backtrack on its statement from its opening brief that "[a] "server selector" is another name for a load balancer" by claiming that "the asserted claim expressly recite[s] that a server is selected to balance 'load.'" Reply Br. at 44. But the claim recites selecting a server based on load *or geographic proximity*, and Nielsen offers no basis to restrict the claim to using geographic proximity only to ultimately balance load, despite the specification's description of load as just one of the possible factors. *See* '823 patent, 6:3-8 ("transmissions . . . are directed to an appropriate server . . . based on current load, geographic location, *and/or other factors*."). Nothing in *Dyfan* says that Nielsen may rely on extrinsic evidence *to the exclusion* of the intrinsic evidence that it contradicts. 28 F.4th at 1366.[15]

### D.    "load" (Claim 6 of the '823 patent)

| Term | Nielsen Proposal | ACRCloud Revised Proposal |
|---|---|---|
| "load" | "prior requests sent to the plurality of data signature stream collection servers" | "work performed and resources used by the server as a percentage of total capacity" |

### 1.    Defendant's Answering Position

Construing the "load" term separately is simpler, easier to understand, and avoids the need for a lengthy construction that could cause confusion for the jury. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("[c]laim construction is a matter of resolution

---

[15] Nielsen's complaint that ACRCloud has not proposed a plain meaning for "server selector" borders on nonsensical. Reply Br. at 45. The term has no plain meaning, because it is a generic nonce word used in the claim to stand in for anything that performs the function.

of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use [by the jury] in the determination of infringement").

The term "load" is used to refer to the "work performed and resources used by the server as a percentage of total capacity" at some point in time. *See* JA, Ex. 20 (The Computer Glossary (2001) at p. 225) ("load" – "In performance measurement, the current use of a system as a percentage of total capacity."); Anderson Decl. at ¶ 42 (confirming dictionary definition is consistent with a POSITA's understanding). This is analogous to everyday uses of the term "load." The "load" of a vehicle, for example, refers to how much weight is on the vehicle at a particular point in time—not to how much "prior" weight had been added (and potentially removed). Likewise, a professor's or a student's "course load" refers to the "load" at a particular time, not to the amount of classes they may have taken previously (and potentially completed).

This commonsense use of the term "load" as referring to the load at a particular point of time is consistent with the intrinsic record, and Nielsen offers no justification for limiting "load" to refer only to "prior" requests. As set forth in the specification and claim, the server may be selected based on either the "load" or the "geographic proximity to the client device." '823 patent, 6:3-8, 16:41-45  The portion of the specification that is directly related to this limitation states that "a plurality of servers **107** are used, and transmissions of data from MCDs **101** are directed to an appropriate server **107** for receipt, based on ***current load***, geographic location, and/or other factors." '823 patent at 6:3-8 (emphasis added). The '823 patent specification thus makes clear that, in the context of the server selector, the term "load" encompasses **current** load, not "prior requests." *Compare* Anderson Decl. at ¶¶ 40-41 *with* Opening Br. at 35-36. The specification also uses the term load in the context of distributing client devices among nodes in a way that prevents them from "becom[ing] overloaded"—again referring to the load at a particular point in time.

'823 patent at 9:46-53. ACRCloud respectfully requests that the Court construe "load" consistent with its everyday usage and reject Nielsen's unsupported attempt to limit the term to "prior requests."

Finally, Neilsen's discussion of prior art load balancing methods is consistent with ACRCloud's construction of "load," and inconsistent with Nielsen's own construction. Each of the "well-known strategies" Nielsen describes involves an effort to reduce the work performed and resources used by a server—not to reduce "prior requests." For example, Nielsen relies on Zhang 1997 to describe "static" balancing, but that reference describes static balancing as a method of reducing the *current* load on systems, not "prior requests." *See* Zhang 1997 (describing systems for "improving system performance" by "determin[ing] how the workload should be balanced among the nodes."). Likewise, Nielsen describes "dynamic" load balancing as reducing the maximum response time of a server, again referring to its *current* load. *See* Westbrook 1995, at 2 (referring to "load" in as referring to the total weight of tasks assigned to a server at a particular time: "The *load* on a server is the sum of the weights of the tasks assigned to it."). In fact, none of the references Nielsen relies upon describe "load" as referring to prior requests. *See, e.g.*, JA, Ex. 11, Sandholm 1998 at 15-16 (describing "selecting the target server from a group of identical servers in order to balance the load," "distribut[ing] the load to other servers" as needed, and avoiding the risk of servers becoming "overloaded").

### 2. Plaintiff's Reply Position

Nielsen requests that the Court construe "load" as part of its construction of the "server selector" term. Separately construing "load" will confuse, rather than aid, the jury by requiring it to combine two definitions. For that reason, this District has declined to separately construe words that are part of a larger limitation. *See TQ Delta, LLC v. AdTran, Inc.*, C.A. No. 14-954-

RGA, 2018 WL 2002481, at *3-5 (D. Del. Apr. 27, 2018) (Declining to construe "value for an increase in noise" separate from the larger term "wherein the [first/second] SNR margin specifies a [first/second] value for an increase in noise associated with the [first/second] plurality of carriers.").

Whether construed together or apart, Nielsen's construction correctly defines "load" as "prior requests sent to the plurality of data signature stream collection servers." *See* JA, Ex. 11 at 15 ("server selection as a special form of load balancing … Load balancing deals with the distribution of requests among servers."). In other words, the "stream collector server selector" selects a server based on its knowledge of "prior requests" sent to the "stream collection servers." Those prior requests allow the server selector to make assignments in (1) a "static" manner (*e.g.,* to use the knowledge of which stream collection server received the most recent prior request so that it can assign the next request in a round-robin fashion to the next server in a predetermined order); or (2) a "dynamic" manner (*e.g.,* to use the knowledge of the size of prior requests to each of the stream collection servers so that work may be equalized among servers).

ACRCloud's construction lacks intrinsic support and inappropriately relies on a definition of "load" in the context of performance monitoring, which is entirely different from the context of load balancing (*i.e.* the context of the patent at issue).

        a.      ACRCloud's proposed construction lacks intrinsic support

ACRCloud lacks the intrinsic support to narrow the construction of "load" as it seeks to do. *See 3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013) ("It is axiomatic that we will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history."); *Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 871-72 (Fed. Cir. 2024). Specifically, the claim language and specification say nothing about requiring

the use of "work performed and resources used as a percentage of total capacity" to select a server. *See* JA, Ex. 3, 16:23-45. In fact, the specification discloses a preferred embodiment in which "each node processes a maximum of approximately 50 [mobile client devices] so as not to become overloaded." *Id.*, 9:49-53. Thus, this preferred embodiment does ***not*** select a server based on "work performed and resources used as a percentage of total capacity" (as required by ACRCloud's proposal). Because it would exclude a preferred embodiment, the Court should reject ACRCloud's proposed construction.[16] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (explaining that interpreting a claim such that a preferred embodiment is excluded is "rarely, if ever, correct").

As supposed intrinsic support for its proposed construction, ACRCloud cites another preferred embodiment in the specification in which a server is selected based on the "current load" on the servers. But ACRCloud's construction would improperly exclude that embodiment too because the embodiment does not involve "work performed and resources used as a percentage of total capacity." *See Vitronics*, 90 F.3d at 1583. Indeed, ACRCloud's "work performed" language is the antithesis of "current" load in that "work performed" is the ***work already performed in the past*** (and no longer "current"). Thus, ACRCloud's proposed narrow construction not only ***lacks*** intrinsic evidence—it ***contradicts*** it.

---

[16] ACRCloud's proposed construction would also improperly exclude (1) selecting a server based on static load balancing techniques (*e.g.*, a round-robin technique); and (2) selecting a server based on any dynamic load balancing technique that did not use "work performed as a percentage of total capacity." For example, ACRCloud's proposal would improperly exclude a scheme in which requests are assigned to a server until it meets a 50 MB threshold before assigning requests to the next server. JA, Ex. 1, ¶ 53. ACRCloud's construction would also inappropriately exclude selecting based on tasks that have already been assigned but not yet performed (because it requires "work performed and resources used by the server," *i.e.*, the past tense). In other words, ACRCloud's construction would exclude considering a server's backlog when making a selection because such a backlog would not be "work [already] performed" or "resources [already] used."

In contrast, Nielsen's construction properly accounts for all forms of selecting a server based on load, including the "current load" embodiment (as well as other static and dynamic load balancing), because selecting based on "prior requests" allows the sever selector to keep track of what it previously sent to each server and to use that information to select based on "current load" as well as other factors.[17] In other words, the "current" load is determined by the individual loads (or "requests") the server has ***previously*** been assigned. Nielsen's construction properly affords "selecting . . . based on load" its full scope, which a POSITA would understand to include commonly used static and dynamic load balancing. JA, Ex. 1, ¶¶ 50, 52-53.

ACRCloud's proffered analogies to the load on a vehicle or a student's course load support ***Nielsen's proposal***, not ACRCloud's. *See* Ans. Br. at 49. The current "load" on a vehicle carrying cargo is determined by adding up all the cargo weight that has been added prior to the time of measurement. For example, when a garbage truck drives onto a scale at the entrance of a

---

[17] ACRCloud asserts that three of Nielsen's references (Zhang 1997, Westbrook, and Sandholm) refute Nielsen's proposed construction. *See* Ans. Br. at 50. But that is wrong:

• Zhang 1997 explains that "[p]olicies that use only information about the average behaviour of the system, ignoring the current state, are termed static policies []. Policies that react to the system state are termed dynamic policies []." *See* JA, Ex. 13 at pp. 2 (emphasis in original).) Static policies thus assign servers based on prior requests (*i.e.*, "ignoring the current state"). Dynamic policies determine the "system state" (*i.e.*, the load acquired so far) by determining what prior requests have been made of the server. *See* JA, Ex. 1, ¶¶ 50, 52.

• Westbrook's definition of load as "the sum of weights of the tasks [already] assigned to it" is consistent with load being a measurement of the prior requests sent to the servers. *See* JA, Ex. 17 at pp. 1. Prior requests memorialize previously assigned tasks.

• Sandholm explains: (1) One method of load balancing is static selection such as "round-robin strategy, [where] the servers are invoked starting with one server and then invoking all other servers in turn before invoking the first one again," where keeping track of the next server to invoke involves prior requests; and (2) "Another way of balancing the load is to use request queues. This technique balances the load dynamically. The clients' requests are put in a queue and are then dequeued by the servers ready to process a request" or "invoke on the server that is the least loaded." JA, Ex. 11 at 18. Both are consistent with load being determined by the prior requests sent to the servers.

dump, the current weight (*i.e.*, "load") will reflect the sum of all loads ***previously accumulated*** as the truck went from home to home. Similarly, a student's "course load" is determined by all the individual courses that student has previously added to their schedule.[18]

        b.     ACRCloud bases its proposed construction on the wrong technology.

ACRCloud's proposed construction is entirely based on extrinsic evidence from The Computer Glossary's definition of "load," which relates to a different technology known as "performance measurement." *See* JA, Ex. 20. Indeed, the very next definition in The Computer Glossary (of "load balancing") explains that "load balancing might distribute the incoming transactions evenly to all servers, or it might redirect them to the next available server," which is consistent with Nielsen's construction, not ACRCloud's, because neither involve "work performed and resources used as a percentage of total capacity." *Id.*

        **3.**      **Defendant's Sur-Reply Position**

Nielsen's strained construction of this term not only lacks support in the intrinsic record, but it renders discussions about "load" in the specification unintelligible. For example, replacing Nielsen's proposed construction in the specification results in the following:

- "Since the signature transformation results in a compressed representation of the audio data, performing the transformation at MCD 101 reduces the quantity of data to be transmitted to NOC 106, thus reducing bandwidth requirements and system **[prior requests sent to the plurality of data signature stream collection servers]**." ('823 patent at 4:40-44 ("load" replaced with Nielsen's construction).)

---

[18] ACRCloud misses the point when it contends that selecting a server "involves an effort to reduce the work performed and resources used by a server—not to reduce 'prior requests.'" Ans. Br. at 50. Nielsen's proposed construction does not seek to reduce prior requests. Rather, under Nielsen's construction, selecting based on load means selecting a server based on prior requests—*i.e*., the tasks previously assigned to the servers—and thus, "load."

- "In another embodiment, a plurality of servers 107 are used, and transmissions of data from MCDs 101 are directed to an appropriate server 107 for receipt, based on current **[prior requests sent to the plurality of data signature stream collection servers]**, geographic location, and/or other factors." ('823 patent at 6:4-8 ("load" replaced with Nielsen's construction).)

- "Such a configuration is also a more distributed processing paradigm that can serve to reduce processor **[prior requests sent to the plurality of data signature stream collection servers]** at NOC 106, since NOC 106 need not perform matching operations for a large number of MCDs; rather MCD 101s do their own matching." ('823 patent at 11:47-51 ("load" replaced with Nielsen's construction).)

- "This configuration reduces the processing **[prior requests sent to the plurality of data signature stream collection servers]** on MCD 101." ('823 patent at 11:60-61 ("load" replaced with Nielsen's construction).)

This may be why Nielsen is reluctant to construe "load" as a standalone term: Forcing Nielsen to do so reveals the incoherency of Nielsen's proposed construction in light of the language of the specification and the claim. Therefore, ACRCloud's proposed construction, which is consistent with the specification, should be adopted.

Nielsen cites only *TQ Delta* for the idea that having two constructions rather than one lengthy united construction will confuse the jury, but that case says nothing of jury confusion. Reply Br. at 50-51. Both parties in that case agreed that the term should be construed as part of the larger phrase, and the Court merely declined to also construe it independently, because later uses of the term merely referred back to the antecedent basis in the broader construction. 2018 U.S. Dist. LEXIS 71869, at *14-15. Juries regularly and capably deal with multiple constructions in a case, and construing this term separately adds clarity.

Nielsen complains that ACRCloud's proposal "lacks intrinsic support," but ACRCloud sets forth how the specification deals with "*current* load," and says nothing of "prior requests" as Nielsen proposes. Answering Br. at 49-50. It is *Nielsen* whose proposed construction lacks intrinsic support. Nor does ACRCloud's proposal exclude any proposed embodiment. As ACRCloud explained, its proposed construction—like the everyday definition of "load"—refers to load at a particular point of time, just like the use of "load" in the specification. Answering Br. at 49. It is Nielsen who, without basis, seeks to restrict the term to balancing load based only on "prior requests" to the server, or (apparently) guesses at its current load based on prior requests, rather than its *actual* load at a point in time. Reply Br. at 51.

Nielsen's flawed arguments against ACRCloud's analogies illustrate this point. It alleges that "[t]he current 'load' on a vehicle carrying cargo is determined by adding up all the cargo weight that has been added prior to the time of measurement," but that does not account for cargo that was *later removed*. Reply Br. at 53-54. The "load" is the weight on the vehicle at a point in time. Likewise, it is untrue that "a student's 'course load' is determined by all the individual courses that student has previously added to their schedule" because, obviously, courses may also be dropped. *Id.* The "load" is the load at a point in time, not the amount of tasks previously assigned to a server.[19]

---

[19] Nielsen argues that ACRCloud's construction is "entirely based" on extrinsic evidence, but that is incorrect. Reply Br. at 54. As set forth above, it is based on the claims and specification and a commonsense meaning of "load," which is consistent with the extrinsic evidence. Nielsen's citation to "load balancing" is unhelpful, because the term at issue is *load*. Reply Br. at 54. The "load balancing" efforts Nielsen cites are directed towards reducing load at a point in time, consistent with ACRCloud's definition. *Id.*

POTTER ANDERSON & CORROON LLP

By: /s/ David E. Moore
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel: (302) 984-6000
      dmoore@potteranderson.com
      bpalapura@potteranderson.com

*Attorneys for Plaintiffs The Nielsen Company (US), LLC and Gracenote, Inc.*

Dated: November 10, 2025
12555789 / 14944.00005

SHAW KELLER LLP

By: /s/Andrew E. Russell
      Andrew E. Russell (No. 5382)
      Nathan R. Hoeschen (No. 6232)
      I.M. Pei Building
      1105 North Market Street, 12th Floor
      Wilmington, DE 19801
      Tel: (302) 298-0700
      arussell@shawkeller.com
      nhoeschen@shawkeller.com

*Attorneys for Defendant ACRCloud, Ltd.*